PAUL MARSA, PLAINTIFF–APPELLANT, v. DONALD J. WERNIK, INDIVIDUALLY AND AS THE MAYOR OF THE BOROUGH OF METUCHEN, DONALD J. BARNICKEL, JOHN W. BERTRAND, PATRICIA LAGAY, DENNIS O'LEARY, THOMAS E. SHARP, AND JOHN WILEY, JR., INDIVIDUALLY AND AS MEMBERS OF THE COUNCIL OF THE BOROUGH OF METUCHEN, DEFENDANTS–RESPONDENTS.

Argued November 5, 1980—Decided June 8, 1981.

234

*Robert A. Vort* argued the cause for appellant.

*Martin A. Spritzer* argued the cause for respondents (*Martin A. Spritzer*, attorney; *Dennis J. Conklin*, on the brief).

The opinion of the Court was delivered by

HANDLER, J.

The issue presented in this case is whether the commencement of public meetings of a municipal governing body with a brief exercise, variously referred to as an invocation, prayer or silent meditation, violates the Establishment of Religion Clause of the First Amendment to the United States Constitution. Challenging this practice is a resident and taxpayer of the municipality, an atheist. Defendants are the mayor and members of the municipal governing body.

The facts as they appear from the pleadings and affidavits in conjunction with motions for summary judgment are not complicated and, although controversial, are not controverted. Plaintiff regularly attends meetings of the town council of the Borough of Metuchen. At each meeting there is first a formal announcement to the effect that in calling the meeting there has been compliance with requirements of the Open Public Meetings Act, *N.J.S.A.* 10:4–6 *et seq.* This is followed by the taking of a roll call. The mayor then asks those who so wish, to rise for an invocation or silent meditation which is delivered by a particular member of the municipal council. It appears that the member who gives the invocation has himself determined or selected its

contents. There is nothing to suggest that it is in any way subject to the approval of any other official or person. Four sample messages or invocations are before the Court.[1] It is not clear, however, to what extent these are typical or representative of all such invocations or with what degree of regularity or frequency any of these is actually used.

Plaintiff claims that the practice of opening council meetings with what he calls an invocation, prayer or silent meditation causes him great discomfort and may have the effect of dissuading plaintiff and others from attending these meetings. He has objected to the "invocation" by remaining seated when the mayor asks all present to stand. Defendants admit that meetings are commenced with such an exercise but deny that there is anything legally wrong with the practice. They point out that in the past meetings were customarily opened with an invocation by local clergy until June 1976, when council members individually began giving the invocations.

---

[1]The four invocations are as follows:

[1] Protect and nourish the voice of dissent when it is right, for it may lead to a higher justice. Let us disagree on methods, but let us be united on goals of service to all men.

[2] Let us take the next few moments of silence to each seek in our own way whatever sources of inspiration will help us make those decisions which will be in the best interests of all the citizens of the Borough of Metuchen.

[3] Heavenly Father as always we thank you for many things tonight, especially we thank you for young people, Girl Scouts, Brownies, and above all for Leaders who care and now may we ask that all that we do be for the good of all the people of this community.

[4] Heavenly Father it is most appropriate that in this Country which was founded on the bedrock of religious freedom for all people that we take this opportunity to recognize you and ask for your guidance. First, we thank you for the freedom that we share, in particular, we appreciate our freedom of speech. Second, we ask for your guidance in the decisions that we deliberate on this evening. We all do not share the same opinion on each topic to be considered but we must evaluate the views of others, therefore, we pray for your guidance so that people of Metuchen benefit from our decisions. Third, we ask you to bless those assembled here this evening as well as all the residents of Metuchen.

The trial judge entered summary judgment for defendants, 163 *N.J.Super.* 589 (Ch.Div.1978), applying a three-pronged test set forth by the United States Supreme Court for Establishment Clause cases. The judge concluded that the practice of opening a public meeting with an invocation has a secular purpose, has a primary effect that neither advances nor inhibits religion, and does not foster excessive governmental entanglement with religion. *Id.* at 592–593. He found that the invocations are nondenominational and that participation is noncompulsory. *Id.* at 593. The secular purpose and primary effect of the invocation, he concluded, are to "call on the consciences and moral resolves of those in attendance at the council meeting and to inspire their wisest and fairest participation through a few opening moments of prayer or reflection." *Id.* The judge found minimal entanglement, analogizing to the practice of opening state and federal legislative sessions with prayer. *Id.* at 594. He distinguished cases prohibiting prayer in public schools on the basis of the "impressionability of children and their compulsory school attendance." *Id.* at 591. The Appellate Division affirmed on the opinion below. 171 *N.J.Super.* 587 (1980). Plaintiff appealed to this Court as of right. See *R.* 2:2–1(a)(1).

## I

The principles underlying the Establishment Clause of the First Amendment are clear.[2] As stated by Justice Black in

---

[2]The New Jersey Constitution is not directly implicated here. Our constitution states that "there shall be no establishment of one religious sect in preference to another." *N.J.Const.* (1947), Art. 1, ¶ 4. We have previously held that "our State provision is less pervasive, literally, than the federal provision" which states that "Congress shall make no law respecting an establishment of religion." We have, therefore, generally limited our discussion to the federal provision as interpreted by the United States Supreme Court in situations where under the particular facts no one religious sect was assertedly preferred over other sects. *Resnick v. E. Brunswick Tp. Bd. of Ed.*, 77 *N.J.* 88, 102–104 (1978). See also, *Clayton v. Kervick*, 56 *N.J.* 523, 528 (1970), vacated and remanded 403 *U.S.* 945, 91 *S.Ct.* 2274, 29 *L.Ed.2d* 854 (1971), on remand 59 *N.J.* 583 (1971). It is not suggested in this case that the

*Everson v. Board of Education,* 330 *U.S.* 1, 15–16, 67 *S.Ct.* 504, 511, 91 *L.Ed.* 711, 723 (1947):

The "establishment of religion" clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance, or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or

invocations used are denominational and, indeed, the trial court has determined them to be nondenominational. 163 *N.J.Super.* at 593–594. Our analysis is therefore predicated upon the federal constitution.

Should this change, however, the municipal body would have to undertake to develop compelling criteria to meet the exacting judicial scrutiny required under the New Jersey Constitution to ensure that no religious sect dominates and that no sect is disfavored. See *Tudor v. Bd. of Ed.,* 14 *N.J.* 31, 41–44 (1953) (Vanderbilt, C. J.) (New Jersey Constitution prohibits any religious preference). Such scrutiny may very well be different from that accorded under the federal constitution. See *State v. Schmid,* 84 *N.J.* 535 (1980) (more exacting scrutiny of infringements of free speech under the state as opposed to the federal constitution); also, *State v. Johnson,* 68 *N.J.* 349 (1975).

We further note that the plain words of the New Jersey constitutional provision invite an equal protection analysis, rather than the traditional establishment analysis employed by the United States Supreme Court. See also *N.J.Const.* (1947), Art. 1, ¶ 5 ("no person shall be denied the enjoyment of any civil or military right, nor be discriminated against in the exercise of any civil or military right, nor be segregated in the militia or in public schools, because of religious principles"). See generally, P. Kurland, "Of Church and State and the Supreme Court," 29 *U.Chi.L.Rev.* 1, 5 (1961), republished as P. Kurland, *Religion and the Law* (1962) at 1, 17–18, urging that the establishment and free exercise clauses be merged into a unified principle, "akin to the reading of the equal protection clause," thereby avoiding any inconsistencies between them, *viz*: "religion may not be used as a basis for classification for purposes of governmental action." But see A. Schwartz, "No imposition of Religion: The Establishment Clause Value," 77 *Yale L.J.* 692, 694 (1968), noting that a pure equal protection analysis would lead to irresolvable tensions between establishment and free exercise values. We need not in the context of the present case do more than note some of these possibilities.

groups and vice versa. In the words of Jefferson, the clause against establishment of religion by law was intended to erect "a wall of separation between Church and State."

Over the years governmental action touching upon religious practices, beliefs and attitudes has served to probe the limits of the Establishment Clause. The Supreme Court has defined these limits under a three-element test in order to identify the demarcation between church and state which is at the heart of the Establishment Clause. This standard was succinctly described in *Committee for Public Education and Religious Liberty v. Nyquist*, 413 *U.S.* 756, 772–773, 93 *S.Ct.* 2955, 2965, 37 *L.Ed.2d* 948, 962–963 (1973), *viz*:

> [T]o pass muster under the Establishment Clause the law in question, first, must reflect a clearly secular legislative purpose, second, must have a primary effect that neither advances nor inhibits religion, and, third, must avoid excessive entanglement with religion.

The Supreme Court recently reaffirmed the three-part test applied in Establishment Clause cases in *Stone v. Graham*, —— *U.S.* ——, 101 *St.Ct.* 192, 66 *L.Ed.2d* 199 (1980).

This tripartite test has most often been applied in the area of state aid to nonpublic schools. See, *e.g., Committee for Public Education and Religious Liberty v. Regan*, 444 *U.S.* 646, 100 *S.Ct.* 840, 63 *L.Ed.2d* 94 (1980); *New York v. Cathedral Academy*, 434 *U.S.* 125, 98 *S.Ct.* 340, 54 *L.Ed.2d* 346 (1977); *Wolman v. Walter*, 433 *U.S.* 229, 97 *S.Ct.* 2593, 53 *L.Ed.2d* 714 (1977); *Roemer v. Board of Public Works of Maryland*, 426 *U.S.* 736, 96 *S.Ct.* 2337, 49 *L.Ed.2d* 179 (1976); *Meek v. Pittenger*, 421 *U.S.* 349, 95 *S.Ct.* 1753, 44 *L.Ed.2d* 217 (1975), reh. den. 422 *U.S.* 1049, 95 *S.Ct.* 2668, 45 *L.Ed.2d* 702 (1975); *Committee of Public Education and Religious Liberty v. Nyquist, supra; Tilton v. Richardson*, 403 *U.S.* 672, 91 *S.Ct.* 2091, 29 *L.Ed.2d* 790 (1971), reh. den. 404 *U.S.* 874, 92 *S.Ct.* 25, 30 *L.Ed.2d* 120 (1971); *Lemon v. Kurtzman*, 403 *U.S.* 602, 91 *S.Ct.* 2105, 29 *L.Ed.2d* 745 (1971), reh. den. 404 *U.S.* 876, 92 *S.Ct.* 24, 30 *L.Ed.2d* 123 (1971). These cases often turn upon the third element of the test, namely, the degree of governmental entanglement with religion. See *Resnick v. East Brunswick Tp. Bd. of Education*, 77 *N.J.* 88, 115

(1978). That element, first proffered in *Walz v. Tax Commission of City of New York*, 397 *U.S.* 664, 675, 90 *S.Ct.* 1409, 1414, 25 *L.Ed.*2d 697, 705 (1970) (upholding a state property tax exemption for religious organizations), proscribes "excessive" government involvement in religion, an involvement that entails continuing official surveillance "leading to an impermissible degree of entanglement" in religious activities.

The present case may be contrasted with the school aid cases in that it is one in which government is engaged directly in an activity claimed to be religious in purpose and effect. This situation can be analogized to the Supreme Court cases involving officially sponsored prayers or other religious exercises in public schools. *E. g., Stone v. Graham, supra* (statute required posting of the Ten Commandments on walls of public classrooms); *Abington School District v. Schempp*, 374 *U.S.* 203, 83 *S.Ct.* 1560, 10 *L.Ed.*2d 844 (1963) (students required to read from the Bible and recite the Lord's Prayer in school); *Engel v. Vitale*, 370 *U.S.* 421, 82 *S.Ct.* 1261, 8 *L.Ed.*2d 601 (1962) (teacher recited brief, denominationally neutral prayer, with voluntary participation by students); *West Virginia State Bd. of Ed. v. Barnette*, 319 *U.S.* 624, 63 *S.Ct.* 1178, 87 *L.Ed.* 1628 (1943) (students required to salute flag and recite pledge of allegiance); *cf. Zorach v. Clauson*, 343 *U.S.* 306, 72 *S.Ct.* 679, 96 *L.Ed.* 954 (1952) (students "released" during school day to attend religious schools). Only *Stone v. Graham* explicitly mentioned the "entanglement" element of the three-part test, but all of the cases recognized that, if under either of the initial standards of the three-prong test,—those relating to purpose and effect—the challenged government conduct crosses the pale from the secular to the religious, it would offend the Establishment Clause of the First Amendment.

In this context, where the conduct itself is undertaken directly by governmental officials or personnel, the third element of the tripartite test—excessive government entanglement—is effectively embraced by the other standards of the

test. In such a situation, if direct governmental action constitutes a "religious" practice under the initial components of the three-prong test, namely, the absence of a secular purpose or a primary or principal effect inhibiting or advancing religion, then, by definition, government itself can be said to be actually and directly engaged and, obviously, inextricably "entangled" in religion. In contrast, if the activity offends neither of these standards, then in a constitutional sense religion would not be at all involved. In that converse posture, where government itself is not directly engaged in a religious activity or function, and is not otherwise supervising, working through or dealing with religious entities, there would be no entanglement by government in the religious domain.[3]

Since we are here confronted not with indirect action in the form of "continuing official surveillance" of religious persons or entities but with conduct undertaken directly by government, namely, the opening exercises of public municipal meetings by municipal officials, it will suffice for analytic purposes to concentrate upon the elements of the tripartite test relating to whether the controverted conduct or activity has a secular

---

[3]Given the ingenuity and variegated forms of governmental conduct that can implicate religious concerns, as reflected in numerous illustrative decisions (*Ante* at 250–251) it is not here suggested that "excessive entanglement" is not a viable test in certain contexts, as pointed out in the concurring opinion of Justice Pashman, *post* at 254–255. See, *e. g., State v. Celmer,* 80 *N.J.* 405 (1979), overturning *Schaad v. Ocean Grove Camp Meeting Association,* 72 *N.J.* 237 (1977) (a municipal governing body, actually controlled by a church through its trustees, was quintessential entanglement of government with religion and clearly violative of the Establishment Clause). Thus, even in this case, where direct official action is involved and the only debatable issue is the religious nature or impact of that activity, entanglement as a test is not eliminated. Rather it is derivatively applied when the religious character of such direct official action is determined. This perhaps serves to explain why the Supreme Court decisions involving prayer or religious exercises in public schools undertaken by teachers or school boards rarely discuss or apply separately the "excessive entanglement" standard. *Ante* at 242–243. *E. g., Engel v. Vitale,* 370 *U.S.* 421, 82 *S.Ct.* 1261, 8 *L.Ed.*2d 601 (1962) (official prayer in public school program).

purpose and whether its primary or principal impact either advances or discourages religion.

## II

We turn first to the element of the tripartite test which deals with the presence of a secular purpose. The enunciation of this test has been fairly consistent throughout the cases. The test has been said to call for a showing that there be "a secular purpose," *Lemon v. Kurtzman, supra*, 403 *U.S.* at 612, 91 *S.Ct.* at 2111, 29 *L.Ed.2d* at 755, *Wolman v. Walter, supra*, 433 *U.S.* at 236, 97 *S.Ct.* at 2599, 53 *L.Ed.2d* at 725 (1977), "a clearly secular legislative purpose," *Committee for Public Education and Religious Liberty v. Nyquist, supra*, 413 *U.S.* at 772–773, 93 *S.Ct.* at 2965, 37 *L.Ed.2d* at 962–963. The secular purpose must be legitimate and *bona fide*. See, *e. g., Sloan v. Lemon*, 413 *U.S.* 825, 93 *S.Ct.* 2982, 37 *L.Ed.2d* 939 (1973), reh. den. 414 *U.S.* 881, 94 *S.Ct.* 30, 38 *L.Ed.2d* 128 (1973); *Meek v. Pittenger, supra*; *Walz v. Tax Commission of New York, supra*, 397 *U.S.* at 689, 90 *S.Ct.* at 1422, 25 *L.Ed.2d* at 712 (Brennan, J. concurring). We stated in *Resnick v. E. Brunswick Tp. Bd. of Ed., supra*, 77 *N.J.* at 108, that a legitimate and *bona fide* non-sectarian purpose can be evidenced by "a reasonable legislative statement announcing a colorable secular design." Moreover, the secular purpose need not be exclusive; there can be a duality of purpose. *Abington School District v. Schempp, supra*. A secular purpose may coexist with a nonsecular purpose, so long as the latter does not dominate and is not the predominant or major purpose. *E. g., Lemon v. Kurtzman, supra*.

The proper scope and application of the "secular purpose" standard in terms of this case is best derived from the decisions dealing with prayers or religious exercises in the public schools, which provide the most authoritative proximate analogy to the municipal practice challenged here. In *Abington School District v. Schempp*, a particular state statute required that schools begin each day with readings from the Bible and recitation of

the Lord's Prayer. The Court recognized that a law could partake of more than one objective and acknowledged that permissible secular purposes could have, in part, a religious nature. Of relevance, in terms of the present case, the Court pointed out as examples of such secular purposes that courts and legislatures open official sessions with prayer or the mention of God and that oaths of office call for the help of God. 374 *U.S.* at 212–213, 83 *S.Ct.* at 1566, 10 *L.Ed.*2d at 852–853. The Court, however, rejected the idea that merely alleging a possible secular purpose would satisfy the first part of the test. In testing the strength of such allegations, the Court scrutinized the particular practice in terms of its essential content and found that the true meaning and plain understanding of the conduct—that which was clearly and unmistakably intended to be communicated—was religious. Further, the Court ruled that government may not, under the First Amendment, prefer one religion over another or religion over nonreligion but must remain neutral on both scores. *Id.* at 216, 83 *S.Ct.* at 1568, 10 *L.Ed.*2d at 855. It found that neutrality was breached because the readings were obviously of a religious nature, and that even if the purpose was not strictly or exclusively religious, reading from the Bible clearly and undisputably had a religious character inconsistent with use merely for nonreligious moral inspiration. *Id.* at 224, 83 *S.Ct.* at 1572, 10 *L.Ed.*2d at 859.

In *Engel v. Vitale,* the Court held that a school district's requirement that an "official" prayer be read before class each day violated the First Amendment. Finding the readings clearly a religious activity, the Court said "the constitutional prohibition against law respecting an establishment of religion must at least mean that in this country it is no part of the business of government to compose *official* prayers for any group of the American people to recite *as a part of a religious program* carried on by a government." 370 *U.S.* at 425, 82 *S.Ct.* at 1264, 8 *L.Ed.*2d at 605 (emphasis added). Similarly, in *Stone v. Graham,* the Court held the "preeminent purpose" of posting the Ten Commandments on a school room wall to be "plainly reli-

gious." See also *Epperson v. Arkansas,* 393 *U.S.* 97, 89 *S.Ct.* 266, 21 *L.Ed.*2d 228 (1968) (striking down law prohibiting teaching of evolution in classroom as violative of Establishment Clause).

Thus, the inquiry in terms of the "purpose" test is not whether the invocation or message constitutes or includes a religious communication or a prayer as such but whether its purpose, with or without such a religious message, meaning or connotation, is exclusively, strictly or essentially religious— whether it is religious to a degree sufficient to supplant or displace any secular objective. If the practice is enveloped in an indelible religious hue—if it is "clear[ly] of a religious character [that is] inconsistent with its use for nonreligious" purposes (*Abington School District v. Schempp*), or if its "preeminent purpose" is "plainly religious" (*Stone v. Graham*), or if it can be said to be a "prayer" or similar religious communication used "as part of a religious program" (*Engel v. Vitale*), then it will have failed the "purpose" test.

Plaintiff contends in this case that the exercise used for opening municipal council meetings constitutes prayer or invocations or meditation which is inherently religious and cannot have a legitimate secular purpose. Defendants rely, as did the trial judge, on the argument that the so-called invocation serves only as a call to conscience and fulfills a proper secular aim. The constitutional truth lies somewhere in between.

In addressing this contention, we have not been called upon to ascertain the constitutional validity of any particular invocation or prayer, but to consider the municipal practice or opening exercises generally. This entails the constitutional assessment of a range of so-called invocations as well as an appreciation of the purpose, setting, history and circumstances surrounding these municipal exercises.

In this vein, we find it significant that there has been no express avowal that the purpose of the opening exercise is religious in whole or in part. The opening exercises do not purport to be part of a religious program. They are part of a

municipal legislative session.  The assertion by defendants that the invocations have a secular purpose of calling on the consciences of those in attendance is not frivolous and is supported by the finding of the trial court.  163 *N.J.Super.* at 593.  A purpose to establish a solemn atmosphere and serious tone for the public meetings can be considered a legitimate and *bona fide* secular purpose.  See *Abington School District v. Schempp, supra,* 374 *U.S.* at 212–214, 83 *S.Ct.* at 1565–1567, 10 *L.Ed.*2d at 852–854; *Zorach v. Clauson, supra,* 343 *U.S.* at 312–313, 72 *S.Ct.* at 683, 96 *L.Ed.* at 961.  See also *Bogen v. Doty,* 598 *F.*2d 1110, 1113 (8 Cir. 1979); *Lincoln v. Page,* 109 *N.H.* 30, 241 *A.*2d 799 (1968).  Accord *Grossberg v. Deusebio,* 380 *F.Supp.* 285 (E.D.Va. 1974); *Wood v. Mt. Lebanon Tp. School Dist.,* 342 *F.Supp.* 1293 (W.D.Pa.1972); *Wiest v. Mt. Lebanon School Dist.,* 457 *Pa.* 166, 320 *A.*2d 362 (1974), *cert.* den. 419 *U.S.* 967, 95 *S.Ct.* 231, 42 *L.Ed.* 2d 183 (1974) (invocations at high school graduation ceremonies have secular purpose on the basis of history and tradition).  *Cf. Colo. v. Treasurer & Receiver Gen.,* 378 *Mass.* 550, 392 *N.E.*2d 1195 (Sup.Jud.Ct.1979) (upheld a law authorizing payment of salaries of the chaplains of the state legislature whose function was to give opening prayers;  the secular purpose was to maintain tradition and to achieve solemnity).

■ A legitimate secular purpose also is evident from the content of the sample exercises in this case.  However, two of the four do give thanks to, or seek guidance from a deity or divine being, as expressed by their references to "Heavenly Father."  One in particular, *ante* at 238, n.1 ( # 4), is especially ladened with such expressions.  One might be tempted to conclude at least with respect to that communication, that its religious character is "clear" or "plain" and the religious purpose in using that prayer is "preeminent" and "inconsistent" with any nonreligious purpose.  We decline to do so, however, because it has not been contended or established by the record in this case that this particular invocation or prayer is used with any great frequency or enjoys any special official identity or endorsement.  Although, standing alone, it is of questionable

validity, this invocation is only one of several communications used, and most of the others are not clearly or plainly religious in content or character, even if some have a religious shade in their meaning and tone.

In sum, even though some of the invocations may, when used in a public meeting, inject a religious motif that would otherwise be absent, that religious dimension is not predominant and does not in our view denigrate or dispel the presence of a secular goal. The first part of the tripartite standard tolerates some religious purpose, as long as there is also a *bona fide* and demonstrable secular purpose. That is present in this case. An objective of the opening exercises is to create at municipal council meetings an atmosphere conducive to the open exchanges, cooperative participation, and tolerant and conscientious deliberations of all those present—citizens and officials alike—who are mutually engaged in the discharge of the public's business.

### III

The standard causing greater conceptual and empirical difficulties is that involving the second element of the three-prong test—the "effect" test. It is related to the first—the "purpose" test—but it is not subsumed by it. It recognizes that even though activity has a legitimate secular purpose it may, nevertheless, under the second element of the tripartite standard, have a primary or principal effect that either encourages or discourages religion. See *Committee for Public Education and Religious Liberty v. Nyquist, supra,* 413 *U.S.* at 773, 93 *S.Ct.* at 2965, 37 *L.Ed.2d* at 963. This test is not an easy one to pass. "Many statutory schemes found to be permissible under [the] secular purpose test," we observed in *Resnick v. E. Brunswick Tp. Bd. of Ed., supra,* 77 *N.J.* at 110, "have foundered [because] their primary effect was to advance religion."

Governmental conduct may offend the Establishment Clause under the "primary effect" test if it has a substan-

tial impact upon religion or has "the direct and immediate effect of advancing religion." *Committee for Public Education and Religious Liberty v. Nyquist, supra,* 413 *U.S.* at 785, n.39, 93 *S.Ct.* at 2971, n.39, 37 *L.Ed.2d* at 969, n.39; see L. Tribe, *American Constitutional Law* § 14-9 at 840 (1978). Additionally the primary effect of a questioned practice must not only avoid religion in general, it must be totally nonsectarian. "The First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion." *Epperson v. Arkansas, supra,* 393 *U.S.* at 103-104, 89 *S.Ct.* at 270, 21 *L.Ed.2d* at 234; *Abington School District v. Schempp, supra,* 374 *U.S.* at 216, 83 *S.Ct.* at 1568, 10 *L.Ed.2d* at 855; see *Engel v. Vitale, supra,* 370 *U.S.* at 430, 82 *S.Ct.* at 1266-1267, 8 *L.Ed.2d* at 607. The government posture towards religion should be "a benevolent neutrality." *Walz v. Tax Commission of City of New York, supra,* 397 *U.S.* at 669, 90 *S.Ct.* at 1411, 25 *L.Ed.2d* at 701-702. See also, Note, 74 *Colum. L. Rev.* 1175, 1176 n.7 (1974). Thus, the essential question in terms of whether the religious or secular effect is primary would appear to be whether, in relation to any other impact or effect of the governmental conduct, the *religious* effect is primary rather than secondary, dominant instead of subordinate, substantial as opposed to insubstantial, or direct as contrasted with indirect and remote. In addition, the conduct must not favor in the slightest religion over nonreligion or one sect over another. This inevitably sensitive and complex question is obviously one of comparison and degree.

Though necessarily inviting an assessment of all relevant factors, the application of the "effect" test does not involve simply a mechanical weighing of the relative secular impacts against those which are nonsecular to see which tilt the scales. *Cf. Lemon v. Kurtzman, supra,* 403 *U.S.* at 614, 91 *S.Ct.* at 2112, 29 *L.Ed.2d* at 757 (application of the three-part test is not "a legalistic minuet"). The components of what constitutes a "primary effect" can be gleaned or extrapolated from the Supreme Court cases that have dealt with the analogous situation of prayer or sectarian activities in public schools. The

recurrent factors suggesting the presence or absence of a primary effect upon religion seem to involve (1) the content or meaning of the expression or practice itself; (2) an express avowal or explicit announcement of the purpose of the conduct; (3) the context or surroundings in which the particular conduct is undertaken; (4) the degree of official or governmental participation in or sponsorship of the activity; (5) the class of persons intended to be affected or influenced by the practice; (6) the presence or absence of compulsion upon those participating in the activity, and (7) the extent to which such conduct reflects traditional and long-standing conventions which have a secular character.

The interaction of these factors in the judicial application of the effect test is exemplified in the leading decisions in this area. Thus, in *Engel v. Vitale, supra,* the challenged practice, a school prayer, was one which was (1) religious in content, (2) undertaken in the setting of a public school program, (3) officially sponsored, (4) directed to children, and (5) compulsory. Further, with respect to the practice there was no (1) explicit avowal of any nonreligious purpose or (2) tradition of secularism. The Court also pointed out that in a public school setting, wherein children are taught generally in areas involving moral values and social norms, the school prayer could easily have been perceived as religious instruction. Accordingly, the Court found that the state's program was tantamount to the official establishment of the religious beliefs embodied in the prayer. 370 *U.S.* at 430, 82 *S.Ct.* at 1266, 8 *L.Ed.*2d at 607. To the same effect are *Stone v. Graham, Abington* and *Epperson.* See also *DeSpain v. DeKalb Cty. Community School Dist.,* 384 *F.*2d 836 (7 Cir.1967), *cert.* den. 390 *U.S.* 906, 88 *S.Ct.* 815, 19 *L.Ed.*2d 873 (1968) (teaching a prayer of thanks to school children that did not even mention God violated the First Amendment).

By way of contrast, many cases have countenanced governmental practices as not violative of the Establishment Clause of the First Amendment, notwithstanding the presence

of some of the factors suggestive of religious encouragement. See, e. g., *Bogen v. Doty, supra; Lincoln v. Page, supra* (opening town meetings with an invocation by local clergy); *Colo v. Treasurer & Receiver Gen., supra* (payment of salaries for chaplains of state legislature to give opening prayers); *Wiest v. Mt. Lebanon School Dist., supra; Grossberg v. Deusebio, supra; Wood v. Mt. Lebanon School Dist., supra* (invocation at high school graduation ceremonies); see also *O'Hair v. Andrus*, 613 F. 2d 931 (D.C.Cir.1979) (celebration of Mass by the Pope on the National Mall of Capital); *O'Hair v. Paine*, 312 F.Supp. 434 (W.D.Tex.1969), app. dism. 397 *U.S.* 531, 90 *S.Ct.* 1259, 25 *L.Ed.* 2d 528 (1970), aff'd 432 *F.2d* 66 (5 Cir. 1970), *cert.* den. 401 *U.S.* 955, 91 *S.Ct.* 974, 28 *L.Ed.2d* 238 (1971) (recitation from Bible aboard Apollo flights). We do not necessarily endorse these decisions. Their results may be understood, however, as reflecting the notion that where all of the relevant factors collectively fail to imprint the effect of a governmental practice with a primarily religious character, the Establishment Clause will not have been violated. Thus, in these somewhat variant cases, the absence, in differing degrees and relationships, of (1) an avowed or express religious purpose, or (2) a religious or near-religious context, or a public school setting, or (3) an audience vulnerable to religious influences, such as school children, or (4) compulsory participation, as well as (5) the presence of an arguably secular tradition may have served to enable the questioned practices to surmount First Amendment compunctions. *Cf. Zorach v. Clauson, supra*, 343 *U.S.* at 312–313, 72 *S.Ct.* at 683, 96 *L.Ed.* at 961; *Abington School District v. Schempp, supra*, 374 *U.S.* at 212–213, 83 *S.Ct.* at 1566, 10 *L.Ed.2d* at 852–853.

Turning to the official conduct at issue here, plaintiff argues that the practice of commencing public meetings with what he asserts is a prayer, invocation or meditation has a principal or primary effect of advancing religion because it "places a governmental seal of approval on religion." For this reason, he asserts a violation of the Establishment Clause under the "effect" test. The trial judge disagreed, noting that the primary effect as well

as the secular purpose of the invocations was "to call on the moral consciences and moral resolves" and "to inspire [the] wisest and fairest participation" of those attending the municipal council meeting. 163 *N.J.Super.* at 593. The trial court also believed that it was important that the invocations were nondenominational and noncompulsory which served to dissipate such an effect to further religion. *Id.* at 593–594.

In applying the constitutional analysis to the present case, we conclude that the primary effect of the opening exercises of the council meetings of the Borough of Metuchen is not to promote or inhibit religion. The content of the invocations is not in the main distinctively or plainly religious. The purpose of the exercise is not expressly religious; it is rather to solemnify governmental proceedings. The exercise in its contextual setting is not suggestive of religion or religious ritual; it is conducted as part of a legislative session before a local legislative body. While the opening exercise is conducted by individual council members, and to that extent is under an official aegis, it does not purport to be otherwise officially sponsored or authorized; rather each opening exercise can be viewed as the beliefs or sentiments of the individual in his private capacity. Furthermore, these exercises are not directed to young, impressionable school children. While there exists an element of compulsion in the sense that persons attending these meetings may understandably be under some social pressure to conform their behavior to the norm, there nevertheless is freedom of individual choice.[4] Finally, although longevity itself does not immunize conduct from constitutional invalidity, nor necessarily empty it of plainly religious content, past practices that have become traditional can acquire a predominantly nonsectarian flavor. Here, the exercises reflect an established practice that has become a governmental convention, not unlike many long-

---

[4]This consideration in the context furnished by the record in this case indicates the absence of any issue or strong contention that the challenged municipal practice offends the Free Exercise Clause of the First Amendment.

standing traditions involving nondenominational references to deities, including legislative invocations in the federal Congress and in legislatures, oaths of office, the "In God we Trust" inscription on coins (*Aronow v. United States*, 432 *F*.2d 242 (9 Cir. 1970)), or the pledge of Allegiance.[5] See, *e. g., Zorach v. Clauson, supra*, 343 *U.S.* at 312–313, 72 *S.Ct.* at 683, 91 *L.Ed.* at 961; *Engel v. Vitale, supra*, 370 *U.S.* at 439–440, 446–450, 82 *S.Ct.* at 1271, 8 *L.Ed.*2d at 613–614, 616–619. *Abington School District v. Schempp, supra*, 374 *U.S.* at 212–213, 83 *S.Ct.* at 1565–1566, 10 *L.Ed.*2d at 852–853.

In sum, most of the considerations relevant in ascertaining the primary effect of a particular governmental practice under the Establishment Clause collectively suggest in this case that the effect of the opening exercise or procedure followed in the Borough of Metuchen is not predominantly or primarily one that serves to encourage or inhibit religion. In a constitutional sense, its impact upon religion as such may even be regarded as *de minimis* and thus, in terms of First Amendment strictures, unobjectable. See A. Sutherland, Jr. "Establishment According to *Engel*," 76 *Harv.L.Rev.* 25 (1962).

## IV

Several factors, to summarize, merge and coalesce in this case to permit the challenged practice to survive the First Amendment attack made upon it. These involve the secular purpose of the practice, the neutral content of most of the invocations, the lack of a denominational tone or sectarian emphasis, and the absence of a religious or quasi-religious setting or the involvement of clergy. Additionally, the lack of a

---

[5]We would place in this context the preamble to the New Jersey Constitution which contains several such references to a Deity. *N.J.Const.* (1947). While these constitutional references do not furnish an independent basis for determining that the practices here in issue satisfy the First Amendment, they provide illustrative support for the constitutional analysis which leads us to conclude that these practices do not violate the Establishment Clause.

formal official authorization of the contents of the practice, the nonreligious context of its use as part of a legislative meeting and its relatively incidental role in the public meeting, as well as the nonmandatory participation of adults, as opposed to children, and its grounding in a longstanding tradition, all contribute to the conclusion that the First Amendment has not been offended.

It cannot be overemphasized, however, that we have been confronted in this particular case with a host of variables that have been frozen in the framework fixed by the record on appeal. The number and interrelation of such fluid factors can vary. A change in some—such as more distinctively religious exhortations or the more frequent and recurrent use of those that contain a religious meaning or a more pronounced official endorsement or governmental backing of any particular invocation or a greater degree of compulsion or even public or social suasion to join in the governmental exercise—can easily tip the scales the other way. *Cf. DeSpain v. DeKalb Cty. Community School Dist., supra* (kindergarten recitation of prayer); *Hall v. Bradshaw*, 630 *F.*2d 1018 (4 Cir. 1980), *cert.* den. —— *U.S.* ——, 101 *S.Ct.* 1480, 67 *L.Ed.*2d 613 (1981) (motorist's prayer on official state map); *Chambers v. Marsh*, 504 *F.Supp.* 585 (D.C. Neb.1980) (payment of legislative chaplain's salary). Nevertheless, for present purposes we conclude that the practice of the Borough of Metuchen has passed constitutional muster under the Establishment Clause of the First Amendment as interpreted by the United States Supreme Court.

Accordingly, the judgment below is affirmed. No costs.

PASHMAN, J., concurring.

Because I am concerned that our decision to uphold the Metuchen Borough Council's practice may encourage others to test the tolerance of the Establishment of Religion Clause, I join in the concurring opinion of Justice Clifford underscoring the limitations of our judgment today. At the same time, I also

agree with substantially all of the able opinion of Justice Handler for the Court. My concern is with one step in the Court's analysis of this issue. I would not disregard the need to consider the "excessive entanglement" prong of the three-part test in a case such as this.

The Court states, "where the conduct itself is undertaken directly by governmental officials or personnel, the third element of the tripartite test—excessive government entanglement—is effectively embraced by the other standards of the test." *Ante* at 242–243. I have no objection to this statement in a case where, because of the absence of a secular purpose or because of a primary or principal effect of inhibiting or advancing religion, "government itself can be said to be actually and directly engaged and, obviously, inextricably 'entangled' in religion." *Ante* at 243. Since failure of any one element of the three-part test is a violation of the Establishment Clause, there is no need to evaluate the third element separately when either of the first two has been violated.

I cannot agree, however, that the converse of this proposition is true—that the third element need not be considered, in cases other than those involving "indirect" government conduct, where the first two elements of the test have been satisfied. It was precisely in such situations, where the activity satisfied the first two parts of the test but doubts as to constitutionality nonetheless remained, that the "excessive entanglement" prong developed.

As the Court notes, the earlier Establishment Clause cases, involving officially sponsored religious exercises, spoke only in terms of the purpose and effect of the government practice. *E. g., School District of Abington Tp. v. Schempp*, 374 *U.S.* 203, 83 *S.Ct.* 1560, 10 *L.Ed.2d* 844 (1963); *Engel v. Vitale*, 370 *U.S.* 421, 82 *S.Ct.* 1261, 8 *L.Ed.2d* 601 (1962); *West Virginia State Bd. of Ed. v. Barnette*, 319 *U.S.* 624, 63 *S.Ct.* 1178, 87 *L.Ed.* 1628 (1943). They established the first two prongs of the modern test. The third element, "excessive entanglement," grew out of the "ef-

fect" prong of the test in *Walz v. Tax Commission of City of New York*, 397 *U.S.* 664, 90 *S.Ct.* 1409, 25 *L.Ed.2d* 697 (1970). In determining whether New York City could constitutionally exempt church property from its real estate taxes, the Supreme Court said:

> Determining that the legislative purpose of tax exemption is not aimed at establishing, sponsoring, or supporting religion does not end the inquiry, however. We must also be sure that the end result—the effect—is not an excessive government entanglement with religion. [*Id.* at 674, 90 *S.Ct.* at 1414.]

In later cases, this inquiry was separated into two distinct elements of the test: (1) whether the primary effect of the government practice is to advance or inhibit religion, and (2) whether the practice entangles government excessively with religion. *Lemon v. Kurtzman*, 403 *U.S.* 602, 612–13, 91 *S.Ct.* 2105, 2111, 29 *L.Ed.2d* 745 (1971). The test has recently emerged as clearly comprised of the three prongs—purpose, primary effect, and excessive entanglement. *E. g., Committee for Public Education v. Regan*, 444 *U.S.* 646, 653, 100 *S.Ct.* 840, 846, 63 *L.Ed.2d* 94 (1980); *Meek v. Pittenger*, 421 *U.S.* 349, 358, 95 *S.Ct.* 1753, 1759, 44 *L.Ed.2d* 217 (1975); *Committee for Public Education v. Nyquist*, 413 *U.S.* 756, 773, 93 *S.Ct.* 2955, 2965, 37 *L.Ed.2d* 948 (1973). Our own cases have evaluated Establishment Clause issues in terms of this three-part test. *State v. Celmer*, 80 *N.J.* 405 (1979); *Resnick v. East Brunswick Tp. Bd. of Ed.*, 77 *N.J.* 88 (1978).

Although the "excessive entanglement" prong developed mainly in the context of government aid to religious organizations, there is no reason to limit its application to such cases. It developed because it was needed to prevent constitutional violations where a government practice had neither a religious purpose or primary effect but still involved government too closely with religious activity. The same need is present whether the government practice is aid to religious organizations or some other form of official conduct. Thus, the Supreme Court recently stated the test in full, with all three prongs, when considering a case challenging a government practice which was itself religious. *See Stone v. Graham*, —— U.S. ——, 101 *S.Ct.* 192, 66

*L.Ed.*2d 199 (1980) (posting of Ten Commandments in public schools).

By dividing Establishment Clause cases into two categories, depending on whether government itself is or is not "directly engaged in a religious activity," *ante* at 243, the Court adds a new step to the constitutional test. To determine whether a particular government practice violates the Establishment Clause, henceforth a court must first determine whether "the conduct itself is undertaken directly by governmental officials or personnel," *ante* at 242. If it is, the court will apply only the first two prongs of the test—purpose and effect. If it is not, the court will also apply the third prong—excessive entanglement. Thus, the majority has transformed the well-established and simpler three-prong test, recently reaffirmed in *Stone v. Graham, supra,* into a new test consisting of an initial categorization step followed by a two-prong test in some cases and a three-prong test in others. This complication is totally unnecessary. I believe it is more advisable simply to apply the same three-prong test to all Establishment Clause cases.

The "excessive entanglement" prong of the test would serve well in restricting the Metuchen Council and other government entities from overstepping the permissible bounds of these potentially religious practices. Both the majority opinion and the opinion of Justice Clifford caution against any increase in the "frequency or intensity of these religious expressions." *Post* at 259. I would add that if the Metuchen Council were to get involved in selecting particular clergymen to deliver its opening invocations or selecting particular forms of expression, so that it had to evaluate the merits of competing religions, it might be guilty of "excessive entanglement" although the purpose and primary effect of the practice are still secular. The fact that an official activity offends neither of these two latter standards does not mean that "in a constitutional sense religion would not be at all involved." *Ante* at 243.

In this case, the Council members are not involved as an official body in selecting the form or content of the invocations. Each member takes a turn to present his own personally selected expressions. Also, the Council does not choose among local clergymen to present the opening invocations. Nor has the plaintiff shown any other way in which the government is "excessively entangled" in making religious decisions. Accordingly, I would find that the Metuchen Council's present practice does not foster "excessive entanglement" of government with religion. In another case, where the facts are slightly different, the government practice might not survive scrutiny under the Establishment Clause.

I would retain the "excessive entanglement" prong of the test in all cases to aid in judicial evaluation of government practices which might encroach upon the Establishment Clause although otherwise embracing a purpose and primary effect that are secular.

CLIFFORD, J., concurring.

Justice Handler's navigation through the treacherous waters of the establishment clause is sufficiently cautious to attract my concurring vote. While I view the question as a close one, on the basis of this record I join in the Court's conclusion that the practice challenged here does not have the primary effect of advancing religion over nonreligion.

As I understand that practice, the governing body of the Borough of Metuchen has authorized no more than the solemnification of its proceedings by one of its members, chosen on a rotating basis. The governing body does not—nor could it constitutionally—encourage or require its members to cast that solemnification in religious form or otherwise make it religious in nature. The fact that some members choose a non-sectarian, religious medium of expression should not, without more, be construed as an endorsement of that medium by the governing body. It is specifically because that thought is at the heart of the Court's opinion that I vote with it.

Moreover, the opinion contains an implicit, if not explicit, warning found on the other side of that coin: should the frequency or intensity of these religious expressions be increased so that the practice of solemnification becomes identified unmistakably as a religious one and governmental endorsement may reasonably be inferred, then the practice will be invalidated.

Justice PASHMAN joins in this opinion.

PASHMAN and CLIFFORD JJ., concurring in the result.

*For affirmance*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*For reversal*—None.