MARY K. SMITH, JACQUELINE DONOHOE, HELEN FOLEY, PHYLLIS GIGLIO, AND JOSEPH F. SHANAHAN, APPELLANTS, v. P. PAUL RICCI, PRESIDENT, STATE BOARD OF EDUCATION AND FRED G. BURKE, COMMISSIONER OF EDUCATION, RESPONDENTS.

Argued February 8, 1982—Decided May 25, 1982.

516

*Joseph F. Shanahan* argued the cause for appellants.

*Mary Ann Burgess*, Assistant Attorney General, argued the cause for respondents (*Irwin I. Kimmelman*, Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

CLIFFORD, J.

Appellants challenge a regulation of the State Board of Education (Board) that requires each local school district to develop and implement a family life education program in the public elementary and secondary curricula. *N.J.A.C.* 6:29–7.1. Appellants contend that such a program impinges upon the free exercise of their religion and constitutes an establishment of religion in violation of the United States Constitution. *U.S. Const.* amend. I. They also allege that the process of adopting the regulation did not comply with the requirements of the Administrative Procedure Act, *N.J.S.A.* 52:14B–1 to –15.

The Board adopted the regulation on August 6, 1980. Appellants then sought review in the Appellate Division, *R.* 2:2–3(a)(2). Before argument was heard in the Appellate Division we certified the matter directly. 88 *N.J.* 471 (1981).

I

In January 1979 the Board appointed a committee, called the Family Life Committee, to make recommendations concerning the teaching of family life and human sexuality in the public schools. Prior to that time the Board's policy toward sex education was embodied in a resolution that had been adopted in 1967. That policy recommended but did not require that local school boards develop programs for sex education. A survey by the Department of Education, conducted at the Family Life Committee's request, determined that under the "recommended-but-not-required" policy, only 40 per cent of the state's public school pupils were receiving sex education. See *Report of the Family Life Committee of the New Jersey State Board of Education*, August 1979 (hereinafter Report).

In the Report, the Family Life Committee pointed out several sociological factors and statistics that it believed reinforced the need for sex education. Although the source of these statistics is not given, there is nothing to indicate that they are unreliable nor do appellants dispute them. The Report sets forth the following:

in the United States one in five births is to a teenager between 15 and 19;

in 1977 one million babies were born to girls between the ages of 10 and 18;

in New Jersey in 1977, twelve thousand babies were born to girls between 15 and 19; 60% of these girls were unmarried;

of the teenagers who do become pregnant when in school, about 80% drop out and do not return to complete their education;

research studies continue to show that babies born to adolescent mothers are more apt to be premature and underweight;

babies of low birth weight often suffer from a lag in development through their early years which affects their ability to learn in school;

the incidence of venereal disease in both males and females continues to rise.

The Committee also cited the results of a 1978 Gallup poll indicating that 77 per cent of the public and 95 per cent of the students favored sex education in the schools. However, the Committee pointed out that no research studies had been found that showed a correlation between teaching about human sexuality and a reduction in teenage pregnancy or veneral disease.

The Committee then made the following recommendations:

that the study of family life education as part of the sequential comprehensive kindergarten through twelfth grade curriculum be required;

that the State Board's regulation provide for an excusal policy from sections of the curriculum dealing directly with sex education on parental grounds of conscience;

that the districts provide appropriate services to assist pregnant teenagers and teenage parents;

that the Department of Education be directed to prepare for consideration of the board, administrative code regulations to implement the above recommendations. [*Report, supra,* at 8–10.]

Thereafter, the Commissioner of Education submitted a proposed regulation to the Board, which considered it at its February 6, 1980 meeting. At this meeting members of the public offered comments, both for and against the proposed regulations. The Board then approved the publication of the proposed regulation. The regulation, along with an invitation for comment, was published in the March 1980 New Jersey Register, 12 *N.J.R.* 105 (1980).

At its April 8, 1980 meeting the Board again heard extensive public comment on the proposed regulation. Although a variety of objections were raised, the common theme of those opposed to the family life education program was the fear that it would destroy the prerogative of parents to educate their children on matters involving sexual morality, and would inculcate in pupils concepts and attitudes, especially as related to sexuality, that conflict with their parents' views. Those in favor of the program stressed the need for young people to receive information about family life and sexuality, and saw the program as supplementing rather than replacing parental and religious efforts in this area. At the conclusion of this meeting the Board adopted the regulation by a vote of nine to one.

Less than a month later the New Jersey Senate passed a resolution directing the Board to reconsider the Family Life Education regulation. See Senate Resolution No. 24 (May 1, 1980). In response, the Board reviewed the regulations and made some changes at its meeting on June 11, 1980. The revised regulation was published in the July New Jersey Regis-

ter, 12 *N.J.R.* 388 (1980), and was adopted at the August 6, 1980 meeting.

The regulation required each local district to institute, by September 1981, a policy that would begin the development of a family life education program. The local programs were to be developed through consultation with and participation of teachers, administrators, parents, pupils in grades nine through twelve, physicians, members of the clergy, and other community members. *N.J.A.C.* 6:29–7.1(b). Each year the district must give parents an outline of the curriculum and a list of instructional material, and must permit parents to review all the materials prior to their use in the classroom. The regulation also listed the teaching staff members authorized to teach in the program and provided for in-service preparation for those teachers. It also permitted districts to use "resource people," such as physicians, clergymen, attorneys, and psychologists, to assist with the program's development, and required the Department of Education to give technical assistance to local districts in developing their programs.

The regulation devotes one paragraph to defining "family life education programs." It says:

> (a) As used in this subchapter, "family life education program" means instruction to develop an understanding of the physical, mental, emotional, social, economic, and psychological aspects of interpersonal relationships; the physiological, psychological and cultural foundations of human development, sexuality, and reproduction, at various stages of growth; the opportunity for pupils to acquire knowledge which will support the development of responsible personal behavior, strengthen their own family life now, and aid in establishing strong family life for themselves in the future thereby contributing to the enrichment of the community. [*N.J.A.C.* 6:29.7.1(a)]

As part of its technical assistance to local districts, the Department of Education has provided the districts with curriculum guidelines that clarify the above definition. These guidelines indicate that although the emphasis of the program is on teaching about human sexuality, that is not its only focus. Other areas of study include such topics as "Family Structure," "Growing Up Emotionally," and "Dating." Although a wide

range of physical, psychological, and social phenomena are suggested as appropriate areas of study, the final decision as to what specific topics are appropriate for each district is left to that district. However, local districts must provide a program that satisfies the definition of family life education as given in the regulation.

Finally, the regulation includes an "excusal clause," which states:

(i) The local board of education shall establish procedures whereby any pupil, whose parent or guardian presents to the school principal a signed statement that any part of the instruction in family life education is in conflict with his/her conscience, or sincerely held moral or religious beliefs, shall be excused from that portion of the course where such instruction is being given and no penalties as to credit or graduation shall result therefrom. [*N.J.S.A.* 18A:35–4.6 *et seq.*] [*N.J. A.C.* 6:29.7.1(i)] [1]

Under the excusal policy a pupil will receive instruction in all aspects of the family life education program unless a parent or guardian objects. In such a case, the pupil will be excused, but only from those parts of the program that the parent finds morally, conscientiously, or religiously objectionable.

## II

Appellants' principal objection to the regulation is that it violates both the Free Exercise and Establishment clauses of the First Amendment.

### *Free Exercise Clause*

■ Appellants assert that by teaching about human reproduction, sexuality, and the development of personal and social values, the schools will "inhibit the moral concepts held by those students who have received them through their Judeo-Christian and other home teaching." As a result, children will be exposed to attitudes, goals, and values that are contrary to their own and

---

[1]Even if this paragraph were not included in the regulation, such an excusal policy would be required by statute, *N.J.S.A.* 18A:35–4.7, the wording of which is nearly identical to that used in the regulation.

to those of their parents, and will thereby be inhibited in the practice of their religion. We do not question that this argument is sincerely made. Whether or not it is well reasoned we need not now decide, for we believe that the simple fact that parents can remove their children from any objectionable part of the program is dispositive. If the program violates a person's beliefs, that person is not required to participate. Where there is no compulsion to participate in this program, there can be no infringement upon appellants' rights freely to exercise their religion. See *Medeiros v. Kiyosaki*, 52 *Haw.* 436, 478 *P.2d* 3124 (1970); *Citizens for Parental Rights v. San Mateo County Bd. of Ed.*, 51 *Cal.App.*3d 1, 124 *Cal.Rptr.* 68 (Ct.App.1975), appeal dismissed, 425 *U.S.* 908, 96 *S.Ct.* 1502, 46 *L.Ed.2d* 759 (1976); *Hopkins v. Hamden Board of Education*, 29 *Conn.Sup.* 397, 289 *A.2d* 914 (Ct.Com.Pls.1970), appeal dismissed, 305 *A.2d* 536 (Conn.1973).

Even though the program permits excusal, appellants argue that it nonetheless inhibits the free exercise of their religion. They assert that requiring pupils affirmatively to assert their objection to the program in front of teachers and peers exerts an intolerable pressure on those pupils such that they may be compelled to abandon their beliefs and to choose not to exercise their option to be excused. Relying on *School District of Abington Township v. Schempp*, 374 *U.S.* 203, 83 *S.Ct.* 1560, 10 *L.Ed.2d* 844 (1963), they argue that such pressure is constitutionally unacceptable.

We do not doubt that the exercise of the right to be excluded may be difficult for some. The constitution does not guarantee, however, that the exercise of religion will be without difficulty. The Supreme Court repeatedly has upheld neutral laws of general applicability even though such laws have somehow burdened the exercise of some religions. See, *e.g., United States v. Lee,* —— *U.S.* ——, 102 *S.Ct.* 1051, 71 *L.Ed.2d* 127 (1982) (social security taxes); *Gillette v. United States,* 401 *U.S.* 437, 91 *S.Ct.* 828, 28 *L.Ed.2d* 168 (1971) (selective service laws); *Braunfeld v. Brown,* 366 *U.S.* 599, 81 *S.Ct.* 1144, 6 *L.Ed.2d* 563 (1961) (Sunday

closing laws); *Prince v. Massachusetts,* 321 *U.S.* 158, 64 *S.Ct.* 438, 88 *L.Ed.* 645 (1943) (child labor laws); *Reynolds v. United States,* 98 *U.S.* 145, 25 *L.Ed.* 244 (1879) (polygamy laws).

Appellants' reliance upon *Schempp* is misplaced. What the Court said in *Schempp* was that an excusal policy would not save the challenged program (Bible reading in school) from a claim of unconstitutionality under the Establishment Clause. 374 *U.S.* at 224–25, 83 *S.Ct.* at 1572–1573, 10 *L.Ed.*2d at 859. That holding lends no support to appellants' contentions that a family life education program that allows for conscientious excusal will coerce or cajole pupils into abandoning the exercise of their religion.

Courts in at least two states have addressed the validity of sex education curricula in light of free exercise considerations. In both instances the courts held that where there was adequate provision for excusal on the grounds of conscientiously-held belief, sex education or family life education programs did not offend the Free Exercise Clause. The Supreme Court of Hawaii specifically rejected a *Schempp* -based coercion argument in *Medeiros v. Kiyosaki, supra,* 52 *Haw.* at 442, 478 *P.*2d at 318, holding that where excusal was permitted, no government compulsion inhibiting religion existed. The California Court of Appeals has also rejected appellant's argument that coercion exists despite an excusal policy. *Citizens for Parental Rights v. San Mateo County Bd. of Ed., supra,* 51 *Cal.App.*3d at 17–18, 124 *Cal.Rptr.* at 81–82.

Indeed, both the Hawaii and California courts pointed out that accepting the argument that public schools may not offer curricula that offend the religious or moral views of a particular group would be tantamount to enshrining that group's views as state policy, thereby violating the Establishment Clause. *Medeiros v. Kiyosaki, supra,* 52 *Haw.* at 442–443, 478 *P.*2d at 318–19; *Citizens for Parental Rights v. San Mateo County Bd. of Ed., supra,* 51 *Cal.App.*3d at 18, 124 *Cal.Rptr.* at 82. In *Epperson v. Arkansas,* 393 *U.S.* 97, 89 *S.Ct.* 266, 21 *L.Ed.*2d 228 (1968) the

Supreme Court said, "There is and can be no doubt that the First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma." *Id.* at 106, 89 *S.Ct.* at 271, 21 *L.Ed.*2d at 235. The Court in *Epperson* held that the prohibition of teaching one point of view (evolution) because it was contrary to the religious views of some constituted an impermissible establishment of religion. Appellants' argument is essentially the same as the one rejected in *Epperson.*

Thus, appellants' argument based on the Free Exercise Clause is flawed in two ways. First, the regulation, because of the excusal clause, does not inhibit the free exercise of religion. Second, to permit the appellants to control what others may study because the subject may be offensive to appellants' religious or moral scruples would violate the Establishment Clause.

### Establishment Clause

Appellants contend that the regulation violates the Establishment Clause in that the family life education program will establish secularism (or "Secular Humanism") as a religion and inhibit all traditional religions to the point of establishing secularism as a religion. Appellants' argument focuses on a single part of the *Lemon* tripartite test (*Lemon v. Kurtzman*, 403 *U.S.* 602, 91 *S.Ct.* 2105, 29 *L.Ed.*2d 745 (1971)) that the Supreme Court has articulated for identifying the boundaries between church and state. In order to withstand constitutional scrutiny the challenged regulation must have a secular purpose, its primary effect must neither advance nor inhibit religion, and it must not create excessive government entanglement with religion. *Stone v. Graham*, 449 *U.S.* 39, 101 *S.Ct.* 192, 66 *L.Ed.*2d 199 (1980); *Lemon v. Kurtzman, supra*, 403 *U.S.* at 612–13, 91 *S.Ct.* at 2111, 29 *L.Ed.*2d at 755; see *Marsa v. Wernik*, 86 *N.J.* 232, 241 (1981).

Appellants do not contend that the regulation is nonsecular; their argument assumes its secularity. Nor do they present a

valid argument that the regulation fosters excessive governmental entanglement with religion.[2] The gravamen of their Establishment Clause argument is that the regulation, because it is secular, will in its primary effect inhibit religion.

This argument is unpersuasive. There is absolutely nothing in the regulation or in the curriculum guidelines that gives even the slightest indication that the program favors a "secular" view of its subject matter over a "religious" one. The program is, as it must be, neither antagonistic toward religion nor supportive of non-religion. The mention of religion in the classroom is not forbidden. Indeed, it might be entirely appropriate in the context of discussing sexuality for a teacher to mention that different religions have different views as to the morality of certain aspects of sexual behavior and to encourage the students to seek guidance from their parents and clergymen. As one writer has stated,

As long as the state does not unfairly represent any moral views that might undercut the teaching of a child's religion, sex is as unobjectionable a classroom subject as lyric passages from the Bible. Further, such a course need not be "dehumanizing," or constitute a "religion of secularism". Competing moral interpretations of sex may still be discussed, provided that one particular interpretation is not stressed to the exclusion of others. [Comment, *Sex Education: The Constitutional Limits of State Compulsion*, 48 *S.Cal.L.Rev.* 548, 563 (1970) (footnotes omitted).]

The regulation is barren of any requirement that a point of view, be it secular or religious, must be stressed to the exclusion of others. We therefore hold that this program does not contravene any of the three requirements of the *Lemon* test and does not constitute an establishment of religion.

---

[2] Appellants only "excessive entanglement" argument—that because the regulation permits consultation with members of the clergy in developing the program it fosters excessive entanglement—is clearly without merit. Indeed, although we need not decide the issue here, it appears that if members of the community in general are being consulted, members of the clergy could not be excluded without violating their right of free exercise of religion. See *McDaniel v. Paty*, 435 *U.S.* 618, 98 *S.Ct.* 1322, 55 *L.Ed.*2d 593 (1978) (holding unconstitutional a Tennessee statute that prohibited members of the clergy from serving in the legislature).

### III

Appellants argue that the Board's action in adopting *N.J.A.C.* 6:29–7.1 violates the Due Process Clause of the Fourteenth Amendment because the Board did not show a reasonable relationship between the goals of the family life education program and the means adopted.

The Board, on the other hand, maintains that the Family Life Committee Report, as well as the testimony of knowledgeable people such as the Commissioner of the Department of Health and the Commissioner of Human Services, supports the view that not only is there a relationship between the program and the reduction of teenage pregnancy, venereal disease, and other social problems, but also the program is necessary if these problems are to be ameliorated.

It is well established that a presumption of reasonableness attaches to the actions of an administrative agency and that the burden of proving unreasonableness falls upon those who challenge the validity of the action. *In re Public Hearings on the Amended Determination of the Commuter Operating Agency for Fiscal Year 1975–76*, 142 *N.J.Super.* 136, 156 (App. Div.), certif. den., 72 *N.J.* 457 (1976). Appellants have offered no evidence to meet that burden but instead merely assert that there are no data that prove that the program will have any effect on the societal ills that it attacks. This bare assertion does not satisfy appellants' burden of proving that the regulation is unreasonable.

In addition, the record reveals a sufficient factual basis for the Board's conclusion that the family life education program is a reasonable, desirable, and necessary method of dealing with readily identifiable educational and social problems. If the Board were required to prove the efficacy of each curricular program before implementing it, the Board's ability to operate would be severely and unnecessarily encumbered. No such proof is required.

## IV

Appellants have argued that the process followed by the Board in adopting the regulation was procedurally unsound. After a careful study of the record we conclude that those procedures were in accord with both the letter and the spirit of the Administrative Procedure Act, *N.J.S.A.* 52:14B–1 to –15. We find no procedural irregularity.

We have also carefully considered appellants' argument that the Legislature's grant of rulemaking power to the Board was illegal because it lacked adequate standards. We find that argument to be without merit.

The action of the State Board of Education is:

Affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices PASHMAN, CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—7.

*For reversal*—None.