953 A.2d 790

NEW JERSEY DEPARTMENT OF CHILDREN AND FAMILIES' INSTITUTIONAL ABUSE INVESTIGATION UNIT, RESPONDENT, v. S.P., APPELLANT.

IN THE MATTER OF PHYSICAL ABUSE CONCERNING E.V., A MINOR.

NEW JERSEY DEPARTMENT OF CHILDREN AND FAMILIES' INSTITUTIONAL ABUSE INVESTIGATION UNIT, RESPONDENT, v. G.W., APPELLANT.

IN THE MATTER OF PHYSICAL ABUSE CONCERNING F.R., A MINOR.

Superior Court of New Jersey
Appellate Division

Argued April 9, 2008—Decided August 27, 2008.

Before Judges PARKER, R.B. COLEMAN, and LYONS.

*Louis P. Bucceri* argued the cause for appellants S.P. and G.W. (*Bucceri & Pincus,* attorneys; *Mr. Bucceri,* of counsel and on the briefs).

*Kelley L. Johnston,* Deputy Attorney General, argued the cause for respondent in A–2522–06T2 (*Anne Milgram,* Attorney General, attorney; *Patrick DeAlmeida,* Assistant Attorney General, of counsel; *Ms. Johnston,* on the brief).

*Lauren F. Carlton,* Assistant Attorney General, argued the cause respondent in A–4807–06T2 (*Anne Milgram,* Attorney General, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Ms. Carlton,* on the brief).

The opinion of the court was delivered by

PARKER, J.A.D.

These back-to-back cases involve appeals by public school employees from the conclusions regarding allegations of abuse investigated by the Institutional Abuse Investigation Unit (IAIU) of the Department of Children and Families. In both cases, we remand to the IAIU for modification of its reports.

*S.P.*

In Docket No. A–2522–06T2, S.P. appeals from a report dated November 29, 2006 in which the IAIU determined that the allegations of physical abuse injurious to the health and welfare of E.V. were unfounded under *N.J.S.A.* 9:6–8.21. Nevertheless, the report indicated that S.P.'s "action was inappropriate and placed the child at some risk of harm." The IAIU made no recommendations for disciplinary or corrective action. The investigation of S.P. was initiated on October 3, 2006, when the Department of Children and Families (DCF) received a referral from its North Passaic local office that six-year-old E.V. "alleged that his classroom teacher . . . [had] kicked him repeatedly on his ribs while he was on the floor," on September 27, 2006. The local DCF case worker was conducting a monthly visit with E.V. on October 3, 2006, when E.V.'s foster parent reported the alleged abuse. According to the foster parent, E.V. told his bus driver about the incident, and the bus driver reported the matter to the babysitter, who later informed the foster parent.

When the DCF case worker spoke with E.V., he stated that he was "being bad [at school] and he was on the floor, and his teacher started to kick him." The teacher was later identified as S.P., an Instructional Assistant employed by the Paterson Public Schools (District). The case worker did not observe any visible marks or bruises on E.V., and he did not complain of pain or discomfort.

DCF referred the case to the local IAIU, which assigned an investigator to the matter. Between October and November 2006, the IAIU investigator interviewed the individuals involved in the incident. Although E.V. was five-years-old when he was interviewed, he had communication disabilities and functioned at the level of a child who was twenty-four to thirty months of age. When the interviewer asked specifically about the incident, E.V. said that he was "throwing tables" and the teacher "took paper and wiped [his] eyes."

When he was asked what he told the bus driver, E.V. responded: "I cried because the kids called me 'baby' and I was crying

saying, 'Don't call me baby.'" He also indicated that he felt safe at school and he wanted to go back to school. E.V. never stated to the IAIU investigator that S.P. kicked him.

E.V.'s school bus driver informed the IAIU investigator that E.V. was crying one day because his teacher screamed at him. The bus driver told the investigator that E.V. did not say anything about the teacher kicking him. Both E.V.'s babysitter and his foster mother, however, told the investigator that E.V. said his teacher had kicked or hit him.

The IAIU investigator interviewed the child's special education teacher, Ms. Carswell, on October 5, 2006. She recalled that the incident occurred when E.V. started a tantrum because he wanted a pair of scissors. Carswell continued teaching while S.P. tended to E.V. She informed the investigator that she did not see S.P. kick E.V.; she only heard a "bang" and S.P. say "'Stop,'" after which she then heard S.P. take the chair away from E.V.

Two children, N.G. and D.S., both seven years old, reported having witnessed E.V. kick S.P. and S.P. respond by kicking him. N.G. told the investigator she was sitting at her desk when S.P. kicked E.V. while he was on the floor. She explained that E.V. was "laying on the floor kicking the closet" and S.P. kicked him hard on one leg. D.S. also reported that E.V. "kicked the door and the teacher [S.P.] kicked him back."

S.P. informed the IAIU investigator that E.V. is "[b]asically ... a good kid" unless he doesn't get his way. She noted that he cries everyday and sometimes the principal or vice principal will take him for a walk. S.P. denied kicking E.V. and reported that on the day of the alleged abuse

> E.V. was on the floor crying and kicking. While he was doing that, he was flipping the chair. It was in the corner. I came in the door. E.V. was crying kicking and throwing a chair.... I said to him "You can not throw the chair around, someone may get hurt." So I said, "Please give me the chair." [A]nd he gave it to me and I sat the chair next to the desk. He kept kicking and I told him to get up. I went on back to my desk to do my folders.

S.P. reported that Ms. Carswell was occupied with the other children at the time of the incident.

On October 10, 2006, the IAIU investigator informed the school principal that S.P.'s "actions did not rise to the level of abuse as defined by statute." She did say, however, that it appeared there was "some physical contact" between S.P. and E.V. while he was laying on the floor, but it did not appear that S.P. kicked E.V.

After completion of the interviews, the IAIU issued its report on November 29, 2006 in a letter to the District's Superintendent. Under the heading of "Investigative Finding," the IAIU found that

Physical Abuse/Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare was unfounded in accordance with *N.J.S.A.* 9:6–8.21. However, some information obtained during the investigation raised an issue relative to an action of Instructional Assistant [S.P.]. No adjudicative findings have been made. The [IAIU's] review herein is solely investigative.

The letter also set forth the IAIU's "Evaluation of Facts":

The results of the investigation indicate that Student [E.V.] age six, was not injured by the actions of Instructional Assistant [S.P.]. However, the information gathered indicates that at one point on September 27, 2006, [E.V.] became disruptive and aggressive in class and [S.P.] responded by kicking the child. The information gathered indicates that [E.V.] tossed a chair and told [S.P.] to shut up and at the point he was kicked, was in the midst of a tantrum and was lying on the floor, kicking a closet. Although [S.P.'s] kick was of limited force and [E.V.] was not harmed, [S.P.'s] action was inappropriate and placed the child at some risk of harm. However, [S.P.'s] action did not meet the statutory requirement to find abuse.

The remedial actions taken by the District at the time of the investigation were also enumerated in the letter, but the IAIU made no recommendations for corrective or disciplinary action. The letter was copied to the Passaic County Superintendent and the Manager of the Northern Passaic County IAIU, but was not sent to S.P.

S.P. received a separate letter from the IAIU also dated November 29, 2006. The findings were nearly identical to the letter sent to the District, but the "Evaluation of Facts" differed significantly. In S.P.'s letter, the IAIU stated that her "action placed [E.V.] at some risk of harm; however, [her] action did not meet the statutory requirement to find abuse." There was no description of the incident and no mention of S.P. kicking the child. In December 2006, the District terminated S.P.'s employment, and

she filed a grievance challenging the termination, which is still pending.

On January 11, 2007, S.P. filed her Notice of Appeal of that portion of the November 2006 letter sent to the District, which found E.V. was kicked by S.P. and S.P.'s "action was inappropriate and placed the child at some risk of harm." [1]  S.P. argues that these findings resulted in her termination from employment;  are beyond the statutory authority of the IAIU;  and are not based on substantial evidence.  S.P. also appeals the IAIU's failure to notify S.P. of these findings and recommendations in its November 29, 2006 letter to her.

On September 20, 2007, the IAIU sent another letter to the District amending its findings "[i]n light of a recent court decision."  Under the heading of "Investigative Finding," the IAIU again stated that abuse was unfounded as related to S.P.'s actions. The finding that "some information obtained during the investigation raised concerns regarding the actions of Instructional Assistant [S.P.]" was, however, moved from the "Investigative Finding" section and into the "Evaluation of Facts."

In the "Evaluation of Facts," the IAIU stated that

Physical abuse was unfounded; however, some information obtained during the investigation raised concerns regarding the actions of Instructional Assistant [S.P.]. Statements by witnesses taken during the investigation indicate that [E.V.] became disruptive and aggressive in class and [S.P.] responded by kicking [E.V.]. [E.V.] tossed a chair, told [S.P.] to shut up and kicked a closet while lying on the floor during a tantrum. Although [S.P.'s] kick was of limited force and [E.V.] was not harmed, [S.P.'s] action was inappropriate and placed [E.V.] at some risk of harm. However, [S.P.'s] action did not meet the statutory requirement to find abuse. As previously noted, the [IAIU's] findings have not been adjudicated. The findings are not binding upon the school or conclusive.

Under the heading of "Recommendations for Corrective/Disciplinary Action," the IAIU stated the following: "[i]t was determined that the aforementioned incident suggests a need for some

---

[1] In her brief, S.P. contends that the agency has refused to delete the objectionable language but there is no evidence in the record to demonstrate that she first requested an amended letter before filing her Notice of Appeal.

form of corrective action, however, the need or form of the specific action taken is left to the discretion of the school district and is not mandated or monitored by the [IAIU]." A copy of this letter was sent to S.P. and the Passaic County Schools Superintendent.

In S.P.'s appeal, she argues that (1) the practices and procedures used by the IAIU violate due process and fundamental fairness; and (2) the conclusion reached by the IAIU must be stricken as *ultra vires* because they are not supported by substantial evidence in the record.

## G.W.

With respect to Docket No. A–4807–06T2, G.W. appeals from a report dated April 2, 2007 in which the IAIU indicated that the allegations against G.W. were unfounded under *N.J.S.A.* 9:6–8.21 but that G.W.'s "actions placed [s]tudent F.R. at some risk of harm; however, [G.W.'s] actions were not to the degree required by statute to find abuse."

On February 6, 2007, the DCF received a referral from the principal of a public school in Paterson indicating that an eighth grade student, F.R., had accused his teacher, G.W., of slapping him once on his cheek that morning. The principal also stated that another student in the classroom confirmed that G.W. had slapped F.R. The principal stated that F.R. did not show signs of a visible injury and did not complain of any pain. The principal also reported that a prior allegation of abuse had been made in 2002 against G.W. at another school during a summer program.

DCF referred the matter to the local IAIU for a 24–hour response. The DCF database indicated that the prior allegation of abuse against G.W. in 2002 was not substantiated.

During February and March 2007, an IAIU senior investigator conducted interviews relevant to the alleged incident. F.R. informed the investigator that he left his regular classroom several times a week for a 45–minute bilingual class with G.W. F.R. told the investigator that, on the morning of February 6, he arrived

late for his class with G.W. and was not prepared. He asked G.W. for a notepad and a pencil and proceeded to copy the lesson on the blackboard. Because F.R. was late for class, he was unable to copy all of the material on the board. When G.W. dismissed the class, F.R. told him to wait until he finished copying everything. F.R. reported that G.W.

> got mad and pulled the notebook, ripped the paper and told me, "Go get out of my class!" [G.W.] grabbed my paper so I was talking under my breath. He thought that I had cursed him off. Then he said, "What did you say?" That is when he smacked me on my left side of my face. Then my glasses fell off my face. Sometimes, [G.W.] pretends like he smacks our faces. However, this time he was mad and he did it with force.

F.R. also told the investigator that he went to talk to the principal about the incident but the principal was not available. When he returned to his regular classroom, F.R. claimed that another student said that G.W.'s handprints were on his face. F.R. also claimed that G.W. is "very aggressive" and "yells a lot." He added that "[s]ometimes, playfully, [G.W.] smacks the back of kids' heads with his hands."

The IAIU investigator interviewed seven other students who were present when the incident occurred. Three of those students said they did not witness the interaction between G.W. and F.R. One student spoke only French and, when asked questions, replied that he did not know.

Student witness, A.L., informed the investigator that "[G.W.] does not hit us. He just plays with our head. He taps the side of our head." When questioned about F.R.'s glasses, A.L. explained that they came off of F.R.'s face when he "moved his head as [G.W.] touched the side of his face." J.L.D., another student, witnessed the incident and reported that F.R. cursed at G.W. and it appeared that he was going to hit G.W. He said that G.W. "did not hit [F.R.] he only touched the side of his head and [F.R.'s] glasses flew off." J.L.D. added that G.W. "hardly used any force" and he "hardly saw [any marks] on [F.R.'s] face." A.J., another of G.W.'s students, told the investigator that she "did not see much."

The only thing she actually observed was F.R.'s glasses falling off his face.

After the student interviews, the IAIU investigator interviewed Frank Puglise, the school principal. The investigator advised Puglise that it "appear[ed] that something occurred in [G.W.'s] class and there is some information to indicate a possible issue regarding some physical contact." She requested the school district take remedial action, such as moving G.W. out of the school building temporarily pending the investigation. The IAIU investigator requested that the principal submit a written statement that G.W. would receive administrative counseling regarding the requirement to maintain appropriate interaction with students at all times.

On March 16, 2007, the IAIU met with G.W. and his attorney at the IAIU office. G.W. informed the investigator that on February 6, 2007 he was teaching a small group of bilingual students including F.R. At dismissal time, F.R. refused to return a pad of graph paper G.W. had given him to use during the class. When G.W. attempted to take the pad, F.R. cursed at him and lunged toward the teacher. G.W. reacted by "lift[ing] his ... hand" at F.R. and F.R. "turned his head and his glasses fell down." The student grabbed his glasses and ran out of the room. G.W. explained that he raised his hand because he thought F.R. "was coming at [him]."

On March 21, 2007, the IAIU conducted a follow-up phone call with the principal to inquire about his plans for G.W. The principal indicated that he would like to bring G.W. back if the IAIU tells him that "everything is okay." He also informed the investigator that G.W. would be required to take classroom and anger management training and to review the ethics code, and would not be permitted to pull students out of class without another teacher present. The IAIU recommended that G.W. receive counseling for the school's policy against corporal punishment in addition to the classroom management training. The principal agreed with

the recommendations and indicated he would ensure they were implemented.

On April 2, 2007, the IAIU issued its findings report in a letter to the District Superintendent stating the abuse allegations were "unfounded," but that some information obtained during the investigation "raised an issue relative to the actions of [G.W.]." The report noted that "[n]o adjudicative findings have been made" and the IAIU's review was "solely investigative."

Under the "Evaluation of Facts" section of the report, the IAIU stated

The results of the investigation indicate that Student [F.R.] was not injured by [G.W.'s] actions. However, the information gathered indicates that at the conclusion of [G.W.'s] class on the morning of February 6, 2007, [F.R.] refused to release a paper pad to [G.W.] and became verbally vulgar/abusive towards this teacher, who then responded by striking [F.R.] on the face with an open hand and minimal force. Although [F.R.] was not harmed, [G.W.'s] actions were inappropriate. [G.W.'s] actions placed [F.R.] at some risk of harm; however, [G.W.'s] actions were not to the degree required by statute to find abuse.

The IAIU also cited the remedial action that the school had taken at the time of the investigation but made no additional recommendations in its report. A copy of this letter was sent to both the Passaic County Interim Superintendent and the Office of the Child Advocate.

Another letter issued on April 2, 2007 was sent to G.W. and contained wording nearly identical to the "Investigative Finding" in the letter to the District which stated that physical abuse was unfounded but there were some concerns. The letter addressed to G.W. did not contain a detailed description in the "Evaluation of Facts." Rather, it simply stated "[y]our actions placed Student [F.R.] at some risk of harm; however, your actions were not to the degree required by statute to find abuse."

On May 16, 2007, G.W. filed his Notice of Appeal of that portion of the April 2, 2007 letter sent to the District that found G.W.'s action placed F.R. at some risk of harm. G.W. argued that these findings: (1) resulted in the freezing of his salary in 2007; (2) are beyond the statutory authority of the IAIU; and, (3) are not based

on substantial evidence. Additionally, G.W. appealed the IAIU's failure to provide him with a copy of the findings letter sent to the District.

On September 20, 2007, the IAIU sent a letter amending the April 2, 2007 letter and revising its findings "[i]n light of a recent court decision." A copy of this letter was sent to G.W. Although the child abuse allegations remained unfounded in the revised letter, the IAIU amended its "Evaluation of Facts" as follows:

Physical abuse was unfounded; however, some information obtained during the investigation raised concerns regarding the actions of Teacher [G.W.]. Statements by witnesses taken during the investigation indicate that [F.R.] refused to release a paper pad to [G.W.] and [F.R.] became verbally vulgar/abusive towards [G.W.]. [G.W.] used corporal punishment by striking [F.R.] on the face one time, with an open hand, using minimal force. Although [F.R.] was not harmed, [G.W.'s] actions were not warranted. [G.W.'s] actions placed [F.R.] at some risk of harm. However, [G.W.'s] actions did not meet the statutory requirement to find abuse.

As previously noted, the [IAIU's] findings have not been adjudicated. The findings are not binding upon the school or conclusive.

Under the heading of "Recommendations for Corrective/Disciplinary Action," the IAIU stated the following: "[i]t was determined that the aforementioned incident suggests a need for some form of corrective action, however, the need or form of the specific action taken is left to the discretion of the school district and is not mandated or monitored by the [IAIU]." A copy of this letter was sent to G.W. and to the Passaic County Superintendent.

In his appeal, G.W. argues that (1) the practices and procedures used by the IAIU violate due process and fundamental fairness; (2) the conclusions reached by the IAIU must be stricken as *ultra vires* because they are not supported by substantial evidence in the record; and (3) the IAIU continues to demand confirmation on remedial actions taken by employers in violation of our directive in *In re an Allegation of Physical Abuse Concerning R.P.*, 333 *N.J.Super.* 105, 754 *A.*2d 615 (App.Div.2000).

I

Our review of an administrative decision is narrowly circumscribed. *In re Taylor*, 158 *N.J.* 644, 656, 731 *A.*2d 35

(1999). Great deference is given to administrative decisions, *State v. Johnson*, 42 *N.J.* 146, 159, 199 *A.*2d 809 (1964), and the court will accord a strong presumption of reasonableness to them, *Smith v. Ricci*, 89 *N.J.* 514, 525, 446 *A.*2d 501 (1982). We do not, however, simply "rubber stamp the agency's decision." *Paff v. New Jersey Dept. of Labor*, 392 *N.J.Super.* 334, 340, 920 *A.*2d 731 (App.Div.2007). An administrative decision will be reversed only when it is found to be "arbitrary, capricious or unreasonable or it is not supported by substantial credible evidence in the record as a whole." *Henry v. Rahway State Prison*, 81 *N.J.* 571, 580, 410 *A.*2d 686 (1980).

Both appellants argue that the procedures followed by the IAIU are not authorized by *N.J.A.C.* 10:129–1.1 to 6.4 and "are violative of the due process safeguards ordered by this court in its prior decisions." Both contend that the IAIU is only authorized to make a finding of either "substantiated" or "unfounded."

Upon receipt of a report of alleged child abuse or neglect, DCF must "immediately take such action as shall be necessary to insure the safety of the child." *N.J.S.A.* 9:6–8.11. Under *N.J.S.A.* 9:6–8.10 and –8.11, DCF "has the authority and responsibility to investigate allegations that a school teacher has abused a student." *In re an Allegation of Physical Abuse Concerning L.R.*, 321 *N.J.Super.* 444, 449–50, 729 *A.*2d 463 (App.Div.1999).

In 2005, DCF revised its administrative regulations concerning the findings that may be made as a result of a child abuse investigation, which were codified in *N.J.A.C.* 10:129–1.1 to 6.4; 37 *N.J.R.* 5004(b) (Dec. 19, 2005).[2] Pursuant to *N.J.A.C.* 10:129–5.3(a), "[t]he child protective investigator shall evaluate the available information and, for each allegation, determine whether abuse or neglect has occurred, and shall make a finding of either substantiated or unfounded." The regulations define "substantiated" and "unfounded" as follows:

---

[2] The new regulations were in effect when the IAIU initiated its investigations of the allegations against both appellants.

"Substantiated" means a finding when the available information, as evaluated by the child protective investigator, indicates by a preponderance of the evidence that a child is an abused or neglected child as defined in *N.J.A.C.* 10:133–1.3 because the alleged child victim has been harmed or placed at risk of harm by a parent or guardian.

\* \* \*

"Unfounded" means a finding when:

   i. There is not a preponderance of evidence that the alleged child victim was harmed or placed at substantial risk of harm; or

   ii. There is not a preponderance of evidence indicating that a parent or guardian and child were involved.

[*N.J.A.C.* 10:129–1.3]

These regulations replaced the previous regulations that specified three possible categories of findings resulting from an investigation of alleged child abuse or neglect:

1. "Substantiated" when the available information, as evaluated by the Division representative, indicates that a child is an abused or neglected child as defined in *N.J.A.C.* 10:133–1.3 because the child has been harmed or placed at risk of harm by a parent, caretaker, temporary caretaker or institutional caretaker.

2. "Not substantiated" when the available information, as evaluated by the Division representative, provides some indication that a child was harmed or placed at risk of harm, but does not indicate that the child is an abused or neglected child as defined in *N.J.A.C.* 10:133–1.3; or

3. "Unfounded" when:

   i. There is no evidence of conduct that would pose risk to the child;

   ii. There is no evidence that a parent, caretaker, temporary caretaker, institutional caretaker or child was involved; or

   iii. The available information indicates that the actions of the parent, caretaker, temporary caretaker, or institutional caretaker were necessary and reasonable and the incident was an accident.

[*In re Allegation of Physical Abuse Concerning R.P.,* 333 *N.J.Super.* 105, 111, n. 2, 754 *A.2d* 615 (App.Div.2000) (citing *N.J.A.C.* 10:129A–3.3(a), which was superseded by *N.J.A.C.* 10:129–1.3 in 2005.) ].

After completion of an investigation, DCF "shall notify the school district and the employee of its findings." *N.J.S.A.* 18A:6–7a. "*N.J.S.A.* 18[A]:6–7a clearly requires [DCF] to report the results of its investigation of a child abuse complaint against a teacher to the teacher's employer, regardless of whether the results are favorable or unfavorable." *L.R., supra,* 321 *N.J.Super.*

at 450, 729 *A.2d* 463. In *L.R.*, we found that although DYFS has the authority to report its concerns and recommendations to the school district, the court found that DYFS[3] did not have the statutory authority to order a school district to take specific corrective action or submit a remedial plan. *Id.* at 456, 729 *A.2d* 463.

Moreover, a teacher is not entitled to an adjudicatory hearing to challenge a finding that child abuse allegations are not substantiated, even when DYFS has expressed "concerns" about a teacher's conduct because such a finding is "intrinsically less damaging to reputation than a finding that child abuse charges have been 'substantiated.'" *Id.* at 460, 729 *A.2d* 463. "A finding by DYFS that child abuse charges have not been substantiated, but that there is some indication a child was harmed or placed at risk of harm, is purely investigatory in nature, with none of the procedural protections of an adjudicatory proceeding." *R.P., supra,* 333 *N.J.Super.* at 117, 754 *A.2d* 615 (citations omitted).

A teacher against whom a finding has been made by DYFS expressing concern about the teacher's conduct "has a due process right to challenge the wording of such a finding on the ground that it is misleading and unfairly damaging to his reputation." *R.P., supra,* 333 *N.J.Super.* at 116, 754 *A.2d* 615. "The impact upon a teacher's reputation of a finding by DYFS expressing concern about the teacher's conduct may be significant, especially if it is accompanied by what appears to be an affirmative finding by DYFS that a teacher has had improper physical contact with a student." *Id.* at 115, 754 *A.2d* 615. "The investigatory findings and 'concerns about the teacher's conduct,' warrant 'some due process protection' by 'judicial review and correction [of the findings] to curb administrative abuses.'" *In re A.I.,* 393 *N.J.Super.* 114, 123, 922 *A.2d* 817 (App.Div.2007) (quoting *R.P., supra,* 333 *N.J.Super.* at 114–116, 754 *A.2d* 615) (citations omitted).

---

[3] Prior to the creation of the DCF in 2006, DYFS investigated reports of institutional abuse.

In *A.I.*,[4] we considered whether the IAIU could express "concerns" about a teacher's conduct despite its conclusion that the allegations of child abuse were "unfounded." 393 *N.J.Super.* at 128, 922 *A.*2d 817. We stated that "while ... the finding of abuse was 'unfounded' and, therefore, not substantiated, the final letter to the [school district] referred to 'concerns' about appellant's conduct and stated that her actions were 'unjustified and inappropriate' and 'placed the child at some risk of harm.'" *Id.* at 124, 922 *A.*2d 817.

In response to the appellant's argument that the IAIU's "concerns" were actually conclusions, we noted that the "IAIU is not limited to reporting on abuse in its findings." *Id.* at 128, 922 *A.*2d 817 (citing *L.R., supra,* 321 *N.J.Super.* at 452, 729 *A.*2d 463). The IAIU "is authorized to make recommendations to a district for action when it uncovers behavior that falls short of child abuse but is nonetheless undesirable." *Ibid.* We further explained that "[w]hile the content of findings is not limited, [the] IAIU must now classify allegations as either 'unfounded' or 'substantiated.'" *Ibid.* (quoting *N.J.A.C.* 10:129–1.3).

Although we found that the IAIU acted within its authority in issuing findings that the teacher's conduct was "unjustified and inappropriate" despite finding that the child abuse allegation was "unfounded," we ordered the IAIU to amend its letter to include language emphasizing that the IAIU had neither adjudicated the findings nor could it make binding recommendations:

> In this case, we order the September 7, 2005 letter to the District to be amended to include such language because it also needs to be amended to avoid an improper impression conveyed despite the ultimate finding that the charges of abuse were "unfounded." *Although interviews with students and teachers presented conflicting accounts and no adjudication took place, IAIU's letter to the District stated, as*

---

[4] *A.I., supra,* was decided on May 21, 2007, after the IAIU issued its original findings in these cases and after both appellants had filed their Notices of Appeal. The IAIU requested that the District return the original findings report "[i]n light of a recent court decision." The September 2007 letters served as the amended findings report for the respective appellants, apparently in an effort to comply with A.I.

*if conclusively found, that appellant "grabbed [the student's] ponytail quickly at the same time [the student] was trying to move away and as a result, the student fell to the floor."* Accordingly, even though the section on "Investigative Findings" states that "[n]o adjudicative findings have been made [and] IAIU's review herein is solely investigative," *the factual recitation in the "Evaluation of Facts" should be reworded to reflect this distinction.* The letter should also note that IAIU's findings are not binding or conclusive. However, the overall conclusion that appellant's actions were "unjustified and inappropriate" is supported by the witness accounts, all of which suggest some physical confrontation between [the student] and [the teacher], and need not be deleted.

[393 *N.J.Super.* at 131, 922 *A.*2d 817. (Emphasis added).]

We remanded the matter and directed the IAIU to amend the report. *Ibid.*

In the two cases now before us, rather than amend the investigatory reports as directed in *A.I.*, the IAIU simply added language stating that its "findings have not been adjudicated. The findings are not binding upon the school or conclusive." Moreover, there was no statement in the amended reports indicating that the IAIU had not made any determination of the accuracy of the student's allegations as required by *R.P.*, *supra*, 333 *N.J.Super.* at 117, 754 *A.*2d 615.

██ Accordingly, we remand both matters to IAIU to rewrite the reports to reflect our holdings in *A.I.* and *R.P.* In other words, while the reports may recite conflicting statements of witnesses, immediately thereafter, the reports must clearly articulate that there has been no determination as to the accuracy of the statements. If the IAIU concludes that allegations of abuse were unfounded but that the employee's actions were "unjustified" or "inappropriate," the IAIU must state in its report the *facts* upon which the conclusion is based. We note that an untenured teacher—who may be completely innocent—could have an otherwise promising career terminated by an "unfounded" report that nevertheless expresses concern about "inappropriate" or "unjustified" conduct based upon vague, conflicting or inaccurate reports. Since the teacher who is the subject of an "unfounded" report has no means by which to challenge the report or test the accuracy of statements contained therein, any statement about "inappropriate"

or "unjustified" conduct on the part of the teacher must be supported by facts that have been tested for accuracy or clearly corroborated by eyewitnesses to the purported incident. For example, if a teacher admitted touching a child, that *fact* may be the basis for a statement that the teacher's action was "inappropriate."

## II

S.P. and G.W. further argue that the IAIU's conclusions should be deleted from the final letters to the District as *ultra vires* because they are not supported by substantial evidence. The IAIU responds that it had credible evidence from students who stated they witnessed S.P. and G.W. striking the students. We note, however, that since there had been no determination of the accuracy of witnesses' statements, the IAIU cannot claim that the evidence is "credible" without such a determination.

The "IAIU is not limited to reporting on abuse in its findings." *A.I., supra,* 393 *N.J.Super.* at 128, 922 *A.2d* 817 (citing *L.R., supra,* 321 *N.J.Super.* at 452, 729 *A.2d* 463). The IAIU "is authorized to make recommendations to a district for action when it uncovers behavior that falls short of child abuse but is nonetheless undesirable." *Ibid.* Because it is encouraged to report concerns even when actual child abuse has not been substantiated, the IAIU may raise concerns about inappropriate behavior, when such behavior is supported by facts.

While we do not find the IAIU's conclusions *ultra vires,*[5] because they do not exceed the agency's power or authority, our concern lies on the drawing of conclusions from conflicting statements by witnesses or from statements not tested for accuracy. As we have stated previously, IAIU reports must clearly indicate that the accuracy of the witnesses' statements has not been

---

[5] Black's Law Dictionary (1979) defines "ultra vires" as "[a]cts beyond the scope of the powers of a corporation [or agency] as defined by its charter" or "acts which are in excess of powers granted and not prohibited."

determined. Nevertheless, the IAIU may express concerns to a district respecting policies that may affect the safety of students and teachers. We do not approve of IAIU conclusions that a teacher's actions were "inappropriate," however, without a factual basis or a means by which the accuracy of witnesses' statements leading to such conclusions may be corroborated. *See R.P., supra*, 333 *N.J.Super.* at 117, 754 *A.*2d 615.

### III

■ G.W. argues that the IAIU continues to demand from employers confirmation of remedial actions, contrary to law. The IAIU acknowledges that it may not compel remedial action when abuse or neglect is unfounded. It maintains, however, that its amended reports are in compliance because no recommendations were made and the need for or form of any corrective action was left to the District's discretion. G.W.'s argument merits consideration.

In *L.R.*, we concluded that DYFS does not have the statutory authority to require a school district to take specific "corrective action or submit a plan for remedial action in response to DYFS' investigatory findings" that child abuse is not substantiated. 321 *N.J.Super.* 444, 453, 729 *A.*2d 463 (App.Div.1999); *accord, R.P., supra*, 333 *N.J.Super.* at 118, 754 *A.*2d 615; *A.I., supra*, 393 *N.J.Super.* at 130, 922 *A.*2d 817. "DYFS' authority is limited to the investigation of any allegation of child abuse or neglect against a school employee and notification to 'the school district and the employee of its findings.'" *Ibid.* (quoting *N.J.S.A.* 18A:6–7a). Moreover, if the district decides to take action against the teacher, "it must accord all the due process and contract rights that must be honored before formal action may be taken, and the IAIU's findings may not by themselves provide a basis for the action." *A.I., supra*, 393 *N.J.Super.* at 114, 922 *A.*2d 817 (citing *R.P., supra*, 333 *N.J.Super.* at 118, 754 *A.*2d 615).

In *L.R.*, although DYFS did not substantiate allegations of abuse in its report, DYFS directed the school district to "confirm"

its corrective action "in writing." 321 *N.J.Super.* at 454, 729 *A.*2d 463. We found that by seeking a specific response from the school district, DYFS "implied that the district was required to act in accordance with [its] recommendations, rather than to exercise its own independent judgment in deciding what action, if any, to take." *Ibid.* We concluded "that DYFS should be required to notify the ... school district that DYFS' reports concerning the child abuse allegations against appellants did not require the district to take any disciplinary or other personnel actions but were investigatory findings and recommendations only." *Id.* at 456, 729 *A.*2d 463.

Here, in its September 2007 letter to the District regarding G.W., under the "Recommendations for Corrective/Disciplinary Action" heading the IAIU stated: "[i]t was determined that the aforementioned incident suggests a need for some form of corrective action, however, the need or form of the specific action taken is left to the discretion of the school district and is not mandated or monitored by the [IAIU]."

G.W. argues that "[d]espite [the] admonition that there be no demand from IAIU for confirmation of an employer's remedial action in a case that is not 'substantiated,' the [a]gency ... clearly continues that practice." G.W. cites the notes from the investigator's "Subsequent Supervisory Conference," the "IAIU Investigation Checklist" and correspondence between the IAIU and the school principal as evidence that the investigator sought to obtain documentation from the school concerning its remedial action plan.

IAIU twice sought written confirmation from the District that it took specific action concerning G.W.: First, that G.W. has been reassigned to a position without student contact; and second, that it "need[ed] school to document remedial [action]."

Despite its statement to the contrary in its September 2007 letter, the IAIU's actions prior to the letter suggested that the school district was required to confirm that it had or would take corrective or remedial action. By doing so, the IAIU exceeded its authority under *N.J.S.A.* 9:6–3.1.

Accordingly, we direct the IAIU to amend the September 20, 2007 report by including language stating that since the allegations of abuse were not substantiated, the district was not required to take any disciplinary or other personnel actions against G.W. *L.R.*, *supra,* 321 *N.J.Super.* at 456, 729 *A.*2d 463.

## IV

In summary, we: (1) remand the matters to the IAIU to restate the reports in accordance with sections I and II of this opinion; and 2) order the IAIU to cease and desist its practice of requesting confirmation that a school district has taken or will take any corrective action when its investigation results or will result in a finding of "unfounded."

Reversed and remanded.