**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-5434-12T3
A-0276-13T3

DEPARTMENT OF CHILDREN AND
FAMILIES, INSTITUTIONAL
ABUSE INVESTIGATION UNIT,

Respondent,

v.

D.B.,

Appellant.

_____

DEPARTMENT OF CHILDREN AND
FAMILIES, INSTITUTIONAL
ABUSE INVESTIGATION UNIT,

Respondent,

v.

A.G.,

Appellant.

_____

APPROVED FOR PUBLICATION

OCTOBER 20, 2015

APPELLATE DIVISION

Argued May 19, 2015 — Decided July 29, 2015

Before Judges Reisner, Koblitz and Currier.

On appeal from New Jersey Department of
Children and Families, Institutional Abuse
Investigation Unit, Intake ID: 17589252 and
17717832.

Louis P. Bucceri argued the cause for appellant D.B. (Bucceri & Pincus, attorneys; Mr. Bucceri, of counsel and on the briefs).

Albert J. Leonardo argued the cause for appellant A.G. (Bucceri & Pincus, attorneys; Mr. Leonardo, of counsel and on the briefs).

Salima Burke, Deputy Attorney General, argued the cause for respondent (John J. Hoffman, Acting Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Lori J. DeCarlo, Deputy Attorney General, on the briefs).

The opinion of the court was delivered by

KOBLITZ, J.A.D.

We consolidate these two appeals for the purpose of writing one opinion. Defendant A.G., a teacher's aide for an autistic child, appeals from an August 14, 2013 findings report issued by the Institutional Abuse Investigation Unit (IAIU) of the Department of Children and Families (Department). Defendant D.B., an elementary school art teacher, appeals from an amended August 1, 2013 IAIU findings report. Both defendants contest the validity of N.J.A.C. 10:129-7.3, upon which the Department's findings were based.

D.B. and A.G. both seek to have the Department's findings letter changed from "not established" to "unfounded." We affirm the findings of "not established," but reverse and remand for

the Department to issue new reports in conformity with the clear directions we have previously provided to the agency.

A.G.

We first summarize the factual information with regard to each defendant separately, beginning with A.G. A.G. was employed by the Paterson public schools for twenty-nine years. On May 16, 2013, the Department received a referral from the principal stating that the prior day the teacher of a class of students with learning disabilities saw A.G. hit five-year-old Joey[1] multiple times on his arm with her open hand. Joey had been diagnosed as autistic.

From May to July the IAIU investigator interviewed the following parties: A.G.; the reporting teacher; two adults who were in the classroom at the time; the principal; the school nurse; Joey; Joey's mother; and six of Joey's classmates. The investigator also received copies of notes taken by the principal as well as a May 15, 2013 account of the incident written by the teacher; a May 16, 2013 account written by A.G.; and a May 16, 2013 employee incident report written by A.G. and the principal.

On May 16, 2013, A.G. wrote that:

---

[1] We use initials for the parties and fictitious names for the children to preserve their privacy.

Yesterday at 1:00 p.m. when [we] were doing the math [Joey] was very upset when [a classmate, "Ana"] s[a]t next to another student. [Joey] doesn't want[] [anyone] near to [Ana] so he was very ag[g]ressive and he started hit[t]ing so I was protecting the other[] students. He hit me . . . in the face and scratched me in the right side of my face and left side of my hand. [The teacher] was next to me. [H]e was kicking the chair so I was holding his hands[.] I told him that he needs to respect, that he needs to stop and that he needs to do his work, then he [did] wash his face and hands[.] I was with him, then he did his work (test).

The classroom teacher wrote in her May 15 statement that:

[Joey] did not want to complete his class work and was acting out: screaming and trying to run out of the classroom. When he transitioned to [A.G.'s] group she tried prompting him to complete his work but he did not comply. He threw the classroom materials from the table and ripped a test paper that was in front of him. When [A.G.] asked him to work, [Joey] scratched her face. At this point, [A.G.] started to hit [Joey] repeatedly and stating "You are not going to scratch me" and "You need to have respect". The incident was reported to the building administrator[.]

When interviewed by the investigator on June 14, 2013, the teacher asserted the following. A.G. hit Joey four times. She estimated that on a scale of one to ten, with one being the softest and ten being the hardest, A.G. struck Joey using a force of five to six. She had previously witnessed A.G. pinch or press on a student's neck in order to make the student sit

4

down.   Joey's behavior had improved dramatically after the termination of A.G.

According to the principal's notes, the reporting teacher brought Joey to the office.

> Due to [Joey's] disability, it is difficult to understand what he is saying.  However, the teacher showed him the class picture and had him identify the students and teachers. When he pointed to [A.G.] he was able to say [A.G.'s last name].  He was then asked if she had hurt him.  He said yes and touched his mouth.  He also brought his foot up to his cheek.  He was again asked if she had hurt him.  However, he was not able to respond or elaborate on what had happened. [The teacher] was not sure if and when he had been hit in the areas shown because it was not what she had seen in the particular incident.

Joey's mother, L.N., informed the investigator of the following.  She noticed a bruise on Joey's face in April 2013, and Joey stated that a teacher did it, although he did not identify the teacher.   She had had no concerns about Joey's safety at the school prior to April 2013.  She had photographed and videoed Joey's bruise, and in the video Joey responds to questioning about how he had been bruised, without indicating who was involved.

The investigator tried to interview Joey, but he replied "Sponge Bob" and shut his eyes when asked about a classroom incident with A.G.   The instructional assistant claimed he

witnessed Joey run out of the classroom after which he had to be brought back in and seated by a teacher and himself; Joey began to knock items down; he heard Joey and A.G. scream, but did not see Joey scratch A.G. nor see any marks on Joey. The instructional assistant also stated that although A.G. could be loud and aggressive in her tone of voice, he never witnessed her hit a student.

The investigator interviewed the substitute and the school nurse who examined both A.G. and Joey. They did not see any marks on Joey or marks on A.G.'s face, although A.G. had a small scratch on her hand. Six of Joey's classmates said they had not seen A.G. hit Joey.

A.G. was terminated effective May 31, 2013. The IAIU embodied its findings report in three separate letters dated August 14, 2013. The letters were sent to the state district superintendent, A.G., and Joey's mother.

Each of the three letters included the following text:

> Investigative findings
>
> Physical Abuse/Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare is not established, in accordance with N.J.S.A. 9:6-8.21. No adjudicative findings have been made, as the Institutional Abuse Unit's review herein is solely investigative.

Not established findings are not disclosed in a Child Abuse Registry Check but are maintained in agency records.

The letters to the district superintendent and to Joey's mother continued under the heading "Investigative Observations":

> [Joey,] age [five,] had no observable injuries. On May 16, 2013, [Joey] was examined by the school nurse. The results of the investigation indicate that [Joey] was yelling and throwing papers in class. An adult witness observed [A.G.] smack [Joey] on the hand. [A.G.] denied that she smacked [Joey.] [A.G.] admitted that she put her hand over [Joey's] hand after he scratched her. It should be noted that [Joey] manifested a bruise under his eye in April 2013. However, there was no information to support that [A.G.] caused the injury.
>
> Based upon the information gathered and physical observations of the child, [Joey] is not an abused child as defined by statute. However, the information gathered indicates that [Joey] was harmed or placed at risk of harm by virtue of the incident.

Additionally, each letter included a "Confidentiality Statement" providing that:

> [T]he results of the Department's investigation, including identifying information, are maintained in the Department's files and can only be disclosed as set forth in N.J.S.A. 9:6-8.10a. In accordance with the statute, however, we can release the findings report to administration to help ensure that proper care, treatment or supervision is provided, not only to the specific child or children involved here, but to all children under the care and supervision of the above referenced

7                                                    A-5434-12T3

facility. These reports may be used by any person or entity conducting a disciplinary, administrative or judicial proceeding to determine terms of employment of an officer, employee or volunteer with an agency or organization providing services to children.

### D.B.

On April 24, 2013, the Department received a referral from the principal of a public elementary school in Paterson. The principal reported that Larry, a six-year-old student, said D.B., the child's art teacher, grabbed Larry's arm and scratched the child earlier that day. Over the following three weeks two investigators from the IAIU interviewed the following parties: Larry; D.B.; the principal; five of Larry's classmates; the school nurse; the school security officer; and Larry's mother. An investigator also took photographs of Larry's arm on the day of the referral.

When the principal was interviewed that same day, he explained that earlier in the morning Larry showed him a linear red mark caused by D.B. scratching him. The principal also stated that, although students regularly complained about D.B., this was the first time he saw a raised mark on a child in connection with an incident. Additionally, the principal indicated that he had prior concerns about D.B.'s failure to properly maintain control of her students, asserting that

students in D.B.'s classroom would run around and hit each other.

Shortly after interviewing the principal, an investigator interviewed Larry in the presence of the principal. Larry stated that D.B. had sent him to the security guard because he and a classmate were laughing while refusing to stay seated. The security guard then sent him back into the classroom. When Larry returned to the classroom, he refused to sit down when asked to do so by D.B., which led to D.B. scratching him on his right arm. After Larry was scratched he went back out to the security guard with a classmate, at which time he showed the guard his arm and was then directed to the school nurse. Larry conceded that he did not always listen to D.B.'s instructions during class.

An investigator interviewed Larry's mother, who stated that Larry had informed her about his injury. Larry told her that his teacher grabbed and scratched his arm when he did not comply with her instruction to sit down in class.

An investigator also interviewed D.B., who explained that she saw Larry throwing a chair at a student, but did not touch Larry at all. A "Parent Conference Request/Modification Report," written by D.B., detailed Larry's conduct in her class on the date of the incident. The Report stated that Larry

called another student names, refused to sit down, ran around the classroom, and threw a chair.

The school nurse, who examined Larry's arm, observed three faint reddish marks on Larry's arm, which disappeared after the application of ointment. An investigator reviewed the "Individual Student Health Log," which documented the school nurse's examination of Larry on the referral date.

The investigators also interviewed five of Larry's classmates. Three children stated that Larry threw a chair, and D.B. then grabbed him by the arm and removed him from the classroom. The two other children gave completely divergent accounts. The security guard stated that D.B. called her to the classroom after which she brought Larry to the nurse.

In three separate letters, the IAIU communicated its findings to D.B., the state district superintendent, and Larry's mother. After counsel for D.B. wrote to IAIU seeking certain changes, on August 1, 2013 the IAIU sent amended findings letters to D.B. and the superintendent. The finding of "not established" remained unchanged.

Each of the August 1, 2013 amended letters included the following text under the heading "<u>Investigative Findings</u>": "Physical Abuse/Cuts, Bruises, Welts and Abrasions is not established in accordance with <u>N.J.S.A.</u> 9:6-8.21. No

adjudicative findings have been made. The Institutional Abuse Unit's review herein is solely investigative." Furthermore, the "Investigative Findings" section of the amended letters recited that, "Not established findings are not disclosed in a Child Abuse Registry Check [] but they are maintained in agency records."

The August 1, 2013 amended letters further stated under the heading "Investigative Observations" that:

> [Larry] age [six], was examined by the school nurse who noted three faint red marks on [Larry's] right arm. It was reported that [D.B.] grabbed and scratched [Larry] on his right arm. Four witnesses interviewed reported that [D.B.] made physical contact with [Larry's] right arm. When interviewed [D.B.] denied grabbing [Larry's] arm.
>
> Based upon the interviews and physical observations of the child, [Larry] is not an abused or neglected child as defined by statute. The information gathered indicates that [Larry] was harmed or placed at risk of harm by virtue of the incident.

Each amended letter also included a "Confidentiality Statement" identical to the one included in the letters sent concerning A.G.

In a memorandum dated June 14, 2013, which had attached IAIU's June 3, 2013 findings letter to the superintendent, the principal informed D.B. that due to the district's "zero tolerance policy approach to teachers possibly causing harm to

students," the principal had recommended "additional disciplinary actions ranging from suspension to tenure charges." The same day the superintendent sent D.B. a letter stating that "due to conduct unbecoming," the district would withhold D.B.'s salary increment for the 2013-2014 school year.

I

Both A.G. and D.B. argue that, "IAIU's findings that the child 'was harmed or placed at risk of harm' constitutes an adjudication and not a mere investigatory finding. [A.G. and D.B.] further contend[] that the procedures followed by IAIU in this case are violative of the due process safeguards ordered by this court in its prior decisions."

The Department asserts that N.J.A.C. 10:129-7.3(c)(3), effective April 1, 2013, does not violate the Due Process Clause, and the "promulgation of this regulation is authorized by statute and consistent with the agency's mandated responsibilities under Title Nine, N.J.S.A. 9:6-8.21 to -8.73."

"It is settled that '[a]n administrative agency's interpretation of statutes and regulations within its implementing and enforcing responsibility is ordinarily entitled to our deference.'" Wnuck v. N.J. Div. of Motor Vehicles, 337 N.J. Super. 52, 56 (App. Div. 2001) (quoting In re Appeal by Progressive Cas. Ins. Co., 307 N.J. Super. 93, 102 (App. Div.

1997)).  "Absent arbitrary, unreasonable or capricious action, the agency's determination must be affirmed."  Ibid. (citing R & R Mktg., L.L.C. v. Brown-Forman Corp., 158 N.J. 170, 175 (1999)).  "Although we recognize that deference is generally given to an administrative agency charged with interpretation of the law, we are not bound by the agency's legal opinions." Levine v. State, Dep't of Transp., 338 N.J. Super. 28, 32 (App. Div. 2001) (citing G.S. v. Dep't of Human Servs., 157 N.J. 161, 170 (1999)).  An agency's exercise of its statutorily delegated responsibilities is entitled to a strong presumption of reasonableness and our court will generally defer to that agency's expertise and superior knowledge in the field.  City of Newark v. Natural Res. Council, Dep't of Envtl. Prot., 82 N.J. 530, 539, cert. denied, 449 U.S. 983, 101 S. Ct. 400, 66 L. Ed. 2d 245 (1980).

N.J.S.A. 9:6-8.21(c) provides in pertinent part the definition of an abused or neglected child as follows:

> "Abused or neglected  child" means a child less than 18 years of age . . . whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care . . . by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment;

or by any other acts of a similarly serious nature requiring the aid of the court[.]

Only conduct that is "grossly or wantonly negligent" constitutes failure to "exercise a minimum degree of care" under N.J.S.A. 9:6-8.21(c)(4). G.S., supra, 157 N.J. at 178; L.A. v. N.J. Div. of Youth & Family Servs., 217 N.J. 311, 332 (2014). Not every harm or risk of harm is of such a serious nature to cause a child to become an abused or neglected child. Thus, it is not inconsistent to find that a child was placed at risk of harm and yet was not abused or neglected.

On April 1, 2013, the Department adopted a framework providing four possible findings that are made after the Department evaluates the available information: "substantiated"; "established"; "not established"; and "unfounded."

> 1. An allegation shall be "substantiated" if the preponderance of the evidence indicates that a child is an "abused or neglected child" as defined in N.J.S.A. 9:6-8.21 and either the investigation indicates the existence of any of the circumstances in N.J.A.C. 10:129-7.4 or substantiation is warranted based on consideration of the aggravating and mitigating factors listed in N.J.A.C. 10:129-7.5.
>
> 2. An allegation shall be "established" if the preponderance of the evidence indicates that a child is an "abused or neglected child" as defined in N.J.S.A. 9:6-8.21, but the act or acts committed or omitted do not warrant a finding of "substantiated" as defined in (c)1 above.

3. An allegation shall be "not established" if there is not a preponderance of the evidence that a child is an abused or neglected child as defined in N.J.S.A. 9:6-8.21, but evidence indicates that the child was harmed or was placed at risk of harm.

4. An allegation shall be "unfounded" if there is not a preponderance of the evidence indicating that a child is an abused or neglected child as defined in N.J.S.A. 9:6-8.21, and the evidence indicates that a child was not harmed or placed at risk of harm.

[N.J.A.C. 10:129-7.3(c).]

After completing its investigation, the Department must "notify the alleged perpetrator and others of the outcome of its investigation." In re Allegations of Sexual Abuse at E. Park High Sch., 314 N.J. Super. 149, 155 (App. Div. 1998). Pursuant to N.J.A.C. 10:129-7.3(d) "[a] finding of either established or substantiated shall constitute a determination by the Department that a child is an abused or neglected child pursuant to N.J.S.A. 9:6-8.21[,]" but only findings that are substantiated are disclosed for the purposes of a child abuse record information check. N.J.A.C. 10:129-7.7(a).

If an allegation of abuse or neglect is substantiated, the accused has a right to request an administrative hearing within twenty days of notice of the finding. N.J.A.C. 10:120A-2.5(a); N.J.A.C. 10:120A-4.3(a)(2). However, N.J.A.C. 10:120A-4.3(a)(2) does not provide a right to an administrative hearing for a

finding that abuse or neglect has been "established", "not established", or "unfounded." See N.J.A.C. 10:120A-4.3(a)(2) (providing that by request a person can seek administrative review of substantiated findings); N.J.A.C. 10:120A-2.5(a). When administrative review is not available, such findings are a final decision appealable as of right to the Appellate Division. R. 2:2-3(a)(2). N.J.A.C. 10:129-8.1(b) provides that "[t]he Department shall retain each record which contains a substantiated, established, or not established report, as specified in N.J.A.C. 10:129-7.3."

D.B. and A.G. argue that IAIU findings of "not established" violate due process when sent to other government agencies. In L.R., we explained that a person's due process rights are not violated when IAIU provides its findings to other government agencies, even though the agency has not found abuse or neglect. In re an Allegation of Physical Abuse Concerning L.R., 321 N.J. Super. 444, 460 (App. Div. 1999).

> Appellants also argue that they are entitled to an evidentiary hearing because DYFS[2] damaged their professional reputations by notifying parents and guardians of the alleged abused students and the Newark school district of its investigatory findings. However, we rejected

_____

[2] DYFS, the Division of Youth and Family Services, is now known as the Division of Child Protection and Permanency, and is a division within the Department.

substantially the same argument in [Allegations of Physical Abuse at Blackacre Academy, 304 N.J. Super. 168, 184-85 (App. Div. 1997)]. Although the New Jersey Constitution extends due process protection to personal reputation, "without requiring any other tangible loss," Doe v. Poritz, 142 N.J. 1, 104 (1995), this does not mean that a liberty interest is implicated anytime a governmental agency transmits information that may impugn a person's reputation. DYFS' transmittals of investigatory findings to the parents and guardians of alleged abused students and the school district constituted a significantly more limited dissemination of adverse information than the notifications concerning the presence of Tier II and III sex offenders in a community which the Court in Doe found to require due process protections. 142 N.J. at 103-07. Moreover, a finding that child abuse allegations have not been substantiated but that DYFS has nevertheless expressed "concerns" about a person's conduct is intrinsically less damaging to reputation than a finding that child abuse charges have been "substantiated" or that a person is a convicted sex offender. Therefore, DYFS' limited dissemination of the results of its investigations did not cause the kind of damage to reputation which would entitle appellants to a hearing.

[Ibid.]

Although, in L.R. we were considering the finding of "not substantiated" under the prior framework of the N.J.A.C. 10:129-7.3(c), our reasoning is also valid when considering "not established" under the current N.J.A.C. 10:129-7.3(c)(3).

In In re an Allegation of Physical Abuse Concerning R.P., 333 N.J. Super. 105, 113 (App. Div. 2000), we opined that:

> "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Thus, even if a person has a constitutionally protected interest, it does not automatically follow that the person must be afforded an opportunity for an adjudicatory hearing.
>
> [(internal citations omitted).]

We continued, stating that, "A finding by [the Department] that child abuse charges have not been substantiated, but that there is some indication a child was harmed or placed at risk of harm, is purely investigatory in nature, with none of the procedural protections of an adjudicatory proceeding." <u>Id.</u> at 117 (internal citation omitted).

Similarly, we again reaffirmed this principal in the <u>S.P.</u> case providing that:

> [A] teacher is not entitled to an adjudicatory hearing to challenge a finding that child abuse allegations are not substantiated, even when DYFS has expressed "concerns" about a teacher's conduct because such a finding is "intrinsically less damaging to reputation than a finding that child abuse charges have been 'substantiated.'" "A finding by DYFS that child abuse charges have not been substantiated, but that there is some indication a child was harmed or placed at risk of harm, is purely investigatory in nature, with none of the procedural protections of an adjudicatory proceeding."
>
> [<u>N.J. Dep't of Children & Families' Institutional Abuse Investigation Unit v. S.P.</u>, 402 <u>N.J. Super.</u> 255, 270 (App. Div. 2008) (internal citations omitted).]

A-5434-12T3

We did, however, find that teachers do have the right to challenge the wording of the findings of the Department, which we address later in this opinion. Id. at 270-71. Thus, the notification-of-findings process of N.J.A.C. 10:129-7.3 does not constitute a violation of due process.

D.B. and A.G. also assert that N.J.A.C. 10:129-8.1, which allows the Department to retain unproven accusations forever is a violation of N.J.S.A. 9:6-8.40a. As the case law clearly states, the interest of retaining information about alleged claims of abuse, where some cause for concern is demonstrated, is within the mandate given to the Department to protect children from abuse. The records retained for "substantiated" allegations are the only ones made public, thus D.B. and A.G. have a lesser due process right in regard to information kept for the use of the agency and entities involved in the protection of children.

II

D.B. and A.G. also argue that the conclusion specified by IAIU as to their conduct is beyond the authority of the agency. They argue that the language in the findings letters sent to the superintendents of schools is conclusory, in violation of established case law.

Both D.B.'s and A.G.'s argument that the Department has exceeded its regulatory authority is unpersuasive and inconsistent with New Jersey case law.  We stated in L.R. that:

> "[T]he grant of authority to an administrative agency is to be liberally construed in order to enable the agency to accomplish its statutory responsibilities and . . . the courts should readily imply such incidental powers as are necessary to effectuate fully the legislative intent."  DYFS has been granted broad authority to investigate child abuse allegations, including specific authority to investigate any child abuse allegation against a public school teacher and to report its findings to the teacher's employer.  N.J.S.A. 18A:6-7a.  An investigation of an abuse complaint against a teacher may disclose conduct which poses a threat to the physical or emotional well-being of the teacher's students even though it does not rise to the level of "child abuse" within the intent of N.J.S.A. 9:6-8.21.  Therefore, we are satisfied that DYFS has not only the authority but the responsibility to take reasonable measures to protect students from any threat to their well-being.  The most obvious available measure to protect students from a teacher who poses a danger to their safety or welfare is for DYFS to communicate its concerns and recommendations to the school district which employs the teacher.  The district can then take whatever action it deems appropriate to address DYFS' concerns, including counseling, transfer of the teacher to another assignment or, in an extreme case, termination of employment.  Accordingly, we are satisfied that DYFS has the statutory authority to find that child abuse allegations against a teacher are "not substantiated" but that the teacher's conduct poses a risk of harm to his or her students, and to report those concerns to

20

the school district which employs the teacher.

[L.R., supra, 321 N.J. Super. at 451-52 (emphasis added) (internal citations omitted).]

III

D.B. and A.G. argue that the Department's findings letters to the superintendents of schools violate the requirements of due process and fundamental fairness. In S.P. we explained that:

> A teacher against whom a finding has been made by DYFS expressing concern about the teacher's conduct "has a due process right to challenge the wording of such a finding on the ground that it is misleading and unfairly damaging to his reputation." "The impact upon a teacher's reputation of a finding by DYFS expressing concern about the teacher's conduct may be significant, especially if it is accompanied by what appears to be an affirmative finding by DYFS that a teacher has had improper physical contact with a student." "The investigatory findings and 'concerns about the teacher's conduct,' warrant 'some due process protection' by 'judicial review and correction [of the findings] to curb administrative abuses.'"
>
> [S.P., supra, 402 N.J. Super. at 270 (internal citations omitted).]

In A.I., we determined that the IAIU acted within its authority in issuing its findings but nonetheless ordered the IAIU to amend its letter to embody language explicitly stating

that the IAIU had not adjudicated the findings or could not make binding recommendations, stating that the letter:

> needs to be amended to avoid an improper impression conveyed despite the ultimate finding that the charges of abuse were "unfounded." Although interviews with students and teachers presented conflicting accounts and no adjudication took place, IAIU's letter to the District stated, as if conclusively found, that appellant "grabbed [A.I.'s] ponytail quickly at the same time as [the student] was trying to move away and as a result, the student fell to the floor." Accordingly, even though the section on "Investigative Findings" states that "[n]o adjudicative findings have been made [and] IAIU's review herein is solely investigative," the factual recitation in the "Evaluation of Facts" should be reworded to reflect this distinction. The letter should also note that IAIU's findings are not binding or conclusive. However, the overall conclusion that appellant's actions were "unjustified and inappropriate" is supported by the witness accounts, all of which suggest some physical confrontation between [the student] and [the teacher], and need not be deleted.
>
> [A.I., supra, 393 N.J. Super. at 131 (citation omitted).]

Similar to the A.I. case, the letter dated August 14, 2013 sent to the superintendent of schools regarding A.G. and the amended letter dated August 1, 2013, relating to D.B., failed to include in the "Investigative Observations" section the statement that "IAIU's findings are not binding or conclusive." Ibid. Moreover, in S.P. we opined that simply stating that the

findings are not binding or conclusive is insufficient, and the IAIU's findings must clearly explain that it has made no determination as to the validity of the statements provided by witnesses. S.P., supra, 402 N.J. Super. at 272-73. We noted in R.P. that DYFS is not permitted to convey "the impression that its finding[s] [are] based on an adjudicatory hearing." R.P., supra, 333 N.J. Super. at 117. Therefore, both cases are reversed and remanded to the agency with direction to comply with our holdings in A.I., R.P., and S.P. Any remaining arguments that we have failed to specifically address are without sufficient merit to require discussion in a written opinion. R. 2:11-3(e)(1)(E).

D.B. and A.G. are entitled to findings letters that state, after the conflicting witness statements are presented, that no determination as to the accuracy of the statements has been made. If a statement that there were allegations that a child was harmed or put at risk of harm is included within the "Investigative Observations" section of the letters, it must be followed by the language that "there has been no determination of the accuracy of [the] allegations." R.P., supra, 333 N.J. Super. at 117. The Department's findings of "not established" for both D.B. and A.G. need not be changed to "unfounded."

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5434-12T3