# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0576-18T1

DEPARTMENT OF CHILDREN
AND FAMILIES,

     Petitioner-Respondent,

v.

F.G.,

     Respondent-Appellant.

_____

Submitted February 3, 2020 – Decided February 19, 2020

Before Judges Sabatino and Natali.

On appeal from the New Jersey Department of Children and Families, Division of Child Protection and Permanency, Case Id No. 17279629.

Dunne, Dunne & Cohen, LLC, attorneys for appellant (Leonard B. Cohen, of counsel and on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Donna S. Arons, Assistant Attorney General, of counsel; Arriel Jean Rubinstein, Deputy Attorney General, on the brief).

PER CURIAM

Defendant F.G.[1] appeals from an August 27, 2018 final agency decision of the Department of Children and Families (Division) that determined that abuse and neglect allegations against him were "not established" pursuant to N.J.A.C. 3A:10-7.3(c)(3). After considering the parties' arguments in light of the record on appeal and the applicable legal principles, we vacate and remand for further proceedings.

I.

On July 1, 2018, the Division received a referral which alleged domestic violence between defendant and his wife C.G. (Catherine). The anonymous reporter claimed the source of his knowledge came from information he received from Catherine's "close friends" and video and audio recordings he possessed. He stated he had "immediate concerns" for Catherine and defendant's then seven-year-old daughter A.G. (Alexandra), and that he would be contacting the police as well.

According to the caller, Alexandra "was locked up in a room with [defendant]" the previous night "for hours on end." The caller went on to describe a dispute in which defendant called Catherine a "lowlife," derided her

---

[1] We employ initials and pseudonyms to protect the privacy of the parties. R. 1:38-3(d)(10).

A-0576-18T1

for not maintaining the home, took away her car keys and money, and stated "she need[ed] to clean the house as her punishment." Further, the caller stated that defendant threw Catherine down the stairs and injured her leg. He indicated that defendant had been "keeping the child from [Catherine] . . . and [that Alexandra] ha[d] been vomiting" and experiencing "psychological damage." Moreover, the caller described the situation as "alarming and disturbing" based on "screaming and chaos for hours" and "banging on doors."

The caller also noted past domestic violence incidents, including an allegation "a couple of weeks" prior to the July 1 incident where defendant had "thrown objects at [Catherine] and . . . bruised her eye socket." According to the caller, "[t]here have been physical altercations and [defendant] has thrown [Catherine] down the stairs repeatedly," and Alexandra "has seen it all and is traumatized." Further, the caller noted that defendant "drinks heavily . . . in the home," and that "[t]here are concerns of forced labor with [Catherine]," including "restraints where she cannot leave . . . ."

Shortly after the call, the Division contacted the police. When the Division caseworker and an officer arrived at the home, the caseworker interviewed Catherine. Catherine reported that defendant was downstairs on the phone. In the meantime, she acknowledged that a "heated argument" had

occurred the previous night and that it was "loud," but denied that it became physical and that defendant locked Alexandra in the bedroom. Catherine also noted that she and defendant argued "every few months," but that the arguments never became physical. Further, she stated that she was not afraid of defendant.

Next, the caseworker interviewed defendant, who also acknowledged that the argument occurred and was "very loud" but denied that it became violent. He stated that Alexandra cried at one point, but he and Catherine consoled her. Further, he denied ever pushing Catherine down the stairs, taking the car keys, or withholding money from her. He explained Alexandra's vomiting as the product of eating "a bunch of cupcakes" that night. Defendant also admitted that he and Catherine argued often and were considering separating but denied becoming violent with her. Moreover, defendant noted that he did possess firearms in the home but explained that they were registered.

Two days later, on July 3, 2018, the caseworker met with Alexandra at the home. She told the caseworker that "she feels safe at home with both of her parents" and when defendant sleeps in her room. Further, Alexandra informed the caseworker that "the arguments are verbal only" and that "there is no physical fighting, no shoving, and no pushing." She also stated that her father did not "lock[] her or her mother in [a] room and leave[] them there." Moreover,

A-0576-18T1

Alexandra denied knowing "why her parents argue," that she heard defendant tell Catherine to clean the house, or that "she gets hit when she doesn't listen or doesn't behave."

While the caseworker was waiting for Catherine to get off the phone to speak with her, Alexandra approached her again. She informed the caseworker that "on the day of the incident she was really scared of her father and she was afraid that he was going to hurt her mother." Further, Alexandra stated that "she was afraid to say what happened because . . . she [did]n't want her father to be taken away." Finally, she admitted "that she gets very scared when her father screams at her mother."

That day, the caseworker again spoke with Catherine, who denied the allegation of domestic violence against defendant. Specifically, Catherine stated defendant had been "repairing the water heater" earlier that day but became agitated, and when they came home from a party that night, "[t]hey had an argument and she [did]n't remember what the argument was about." She described this as defendant's "usual personality when he's stressed or frustrated," and that "no one was under the influence of alcohol." Catherine also noted that she was unaware that defendant kept firearms in the home. Finally, she stated

5

that "she always feels safe around" defendant, and that Alexandra "is also safe around [defendant] . . . [and] she would do anything to protect her daughter."

The caseworker then provided Catherine with resources for domestic violence victims. While she indicated she would not reach out to domestic violence services, she stated she would answer a phone call from the Domestic Violence Liaison (DVL) if she received one. The caseworker noted her belief that Catherine "appeared to be minimizing the incident." When the caseworker informed Catherine that Alexandra had expressed fear because of the parents' screaming, Catherine "denied that [Alexandra] told her that she was scared," and that Alexandra "is a happy child and . . . well cared and love[d] by her parents."

Two days later, on July 6, 2018, Catherine contacted the caseworker to request a meeting and informed her that she had been issued a TRO against defendant.[2] Catherine acknowledged that she was "not honest" during the initial conversations and confirmed "everything stated in the referral . . ., except the

---

[2] In her TRO application, Catherine alleged that defendant committed the predicate acts of assault and harassment. She further maintained that defendant screamed profanities and berated her. She also attested that defendant threw multiple bottles and "body[-]checked" her and Alexandra was "[ten] feet away crying." Catherine also alleged that defendant "block[ed] [her] car in the driveway and t[ook] her keys" and locked her out of the house. Catherine also maintained that defendant told her that "she does not contribute to the household in front of [Alexandra]," and called her offensive names.

part where [defendant] threw her down the . . . stairs." She described several years of "financial, psychological, and emotional" abuse and more frequent arguments, though she denied being sexually or physically abused. According to Catherine, defendant "controls her relationship[s] with her family and friends" as well as "how the house is cleaned and organized." With respect to financial abuse, Catherine informed the caseworker that defendant "controls her finances" and that "[s]he cannot manage her money."

Catherine also played an audio recording of the June 30, 2018 incident for the caseworker.[3] According to the caseworker's characterization of the recording, defendant cursed at Catherine and called her names. In the background, Alexandra yelled "stop daddy stop" and began to cry. After the recording ended, Catherine admitted that she was ready to divorce defendant and that Alexandra "is exposed to this violence frequently . . . ." Catherine then started crying "because it took her so long to realize the kind of relationship she [was] in." At the end of the meeting, the caseworker recommended that Catherine meet with the DVL, and Catherine stated she would schedule a meeting.

---

[3] Neither the audio recording, nor a transcript of any portion of the recording, is contained in the record on appeal.

On July 11, 2019, Catherine filed for divorce.[4] The following day, the court entered an order requiring the Division to release records to the court "regarding the status of its investigation into the parties." It also entered an amended TRO providing for additional parenting time for defendant and for him to move back into the marital home, as Catherine was planning to move.

One month later, on August 15, 2018, the parties entered a consent order prohibiting the "parties from committing acts of domestic violence against each other." Among its other provisions, the parties agreed to restrict their contact with each other, granted Catherine pendente lite relief, directed the parties to engage in counseling, and granted joint legal custody of Alexandra. Catherine also agreed to vacate the TRO.

On August 24, 2018, the Division completed a Family Risk Assessment which noted that there had "been more than one incident of domestic violence in the past 12 months (including the current referral)," but found the risk level

_____

[4] Although the divorce complaint is not contained in the record on appeal, the August 15, 2018 consent order states that a joint custody provision is temporary and "will be determined in the . . . FM matter." "The FM docket consists of complaints for dissolution matters including[] divorce . . . ." B.C. v. N.J. Div. of Child Prot. & Permanency, 450 N.J. Super. 197, 207 n.8 (App. Div. 2017). Thus, we glean that defendant's statement in his merits brief stating that a divorce proceeding was underway is accurate.

for abuse and neglect was "Low." The same day, it completed a summary of its investigation and included the following findings:

> Allegations of neglect of [Alexandra] by [defendant] is Not Established. [Alexandra] admitted to fearing [defendant] when he screams at her mother. [Alexandra] denied that [defendant] is physically or verbally abusive towards her. [Catherine] admitted to [defendant] being verbally abusive towards her in front of [Alexandra]. [Catherine] denied that [defendant] has been physically or verbally abusive towards [Alexandra].

The investigatory summary identified the documents relied upon by the Division. Among the documents considered was a "medical collateral" from Dr. Paragus[5] related to Alexandra. The investigatory summary does not list either the amended TRO or the August 15, 2018 consent order.

On August 27, 2018, the Division sent a letter to defendant informing him of its determination that the allegation of child abuse and neglect was "not established" pursuant to N.J.A.C. 10:129-7.3(c)(3). That letter stated that the Division "conducted its required investigation and determined that the allegation was Not Established." It further explained that "the Division enters a finding of 'Not Established' when some evidence indicates that a child was harmed or placed at some risk of harm, but there is not a preponderance of the evidence

---

[5] Dr. Paragus' first name is not included in the record.

that the child has been abused or neglected per N.J.S.A. 9:6-8.21," and that the Division would no longer provide services to Alexandra and her family. The letter did not include a factual discussion, a summary of the circumstances surrounding the allegation, nor the reasons for its determination. This appeal followed.

On appeal, defendant alleges that the Division acted in an arbitrary, capricious, or unreasonable manner in determining that the abuse and neglect allegations were "not established" as opposed to "unfounded."

II.

The scope of our review of a final agency decision is limited. In re Stallworth, 208 N.J. 182, 194 (2011). We "must defer to an agency's expertise and superior knowledge of a particular field," Greenwood v. State Police Training Ctr., 127 N.J. 500 (1992), and "extend substantial deference to an 'agency's interpretation and implementation of its rules enforcing the statutes for which it is responsible' based on the agency's expertise." N.J. Dep't of Children & Families v. R.R., 454 N.J. Super. 37, 43 (App. Div. 2018) (quoting In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 478, 489 (2004)).

Here, we consider whether the Division's "not established" finding is clearly "arbitrary, capricious, or unreasonable" or lacked "fair support in the

record." Dep't of Children & Families v. T.B., 207 N.J. 294, 301 (2011) (quoting In re Herrmann, 192 N.J. 19, 27-28 (2007)); see also Dep't of Children & Families v. D.B., 443 N.J. Super. 431, 440 (App. Div. 2015). "However, we are 'in no way bound by [an] agency's interpretation of a statute or its determination of a strictly legal issue,'" T.B., 207 N.J. at 302 (quoting Mayflower Sec. Co. v. Bureau of Sec. in Div. of Consumer Affairs of Dep't of Law & Pub. Safety, 64 N.J. 85, 93 (1973)), and "if an agency's statutory interpretation is contrary to the statutory language, or if the agency's interpretation undermines the Legislature's intent, no deference is required," Reilly v. AAA Mid-Atl. Ins. Co. of N.J., 194 N.J. 474, 485 (2008) (quoting In re N.J. Tpk. Auth. v. AFSCME, Council 73, 150 N.J. 331, 351 (1997)).

Defendant argues that the Division acted arbitrarily, capriciously, or unreasonably when it issued a determination of "not established" as opposed to "unfounded" with respect to the abuse and neglect allegations against him. Specifically, he questions the veracity of the Division's evidence such as the anonymous referent who the Division never contacted again, the failure of the Division to consider additional evidence, and the failure of the Division to meet with defendant after the initial visit.

A "not established" finding "is one of four outcomes the Division may reach after investigating an abuse or neglect allegation." R.R., 454 N.J. Super. at 40. The Division "shall make a finding that an [abuse or neglect] allegation is 'substantiated,' 'established,' 'not established,' or 'unfounded.'" N.J.A.C. 3A:10-7.3(c). "An allegation shall be 'not established' if there is not a preponderance of the evidence that a child is an abused or neglected child as defined in N.J.S.A. 9:6-8.21, but evidence indicates that the child was harmed or was placed at risk of harm." R.R., 454 N.J. Super. at 40 (quoting N.J.A.C. 3A:10-7.3(c)(3)). Only if "the evidence indicates that a child was not harmed or placed at risk of harm," is the allegation deemed "unfounded." N.J.A.C. 3A:10-7.3(c)(4).[6]

As the Division has explained, "[t]he critical distinction between findings of not established and unfounded is that not established findings are based on some evidence, though not necessarily a preponderance of evidence, that a child

---

[6] Unlike a finding of "substantiated," see N.J.A.C. 3A:10-7.3(c)(1), the Division's regulations do not permit administrative hearings to review a "not established" finding, or the other two findings. See N.J.A.C. 3A:5-4.3(a)(2). Therefore, we deem the Division's finding that the abuse and neglect allegations against defendant were "not established" a final decision subject to appellate review under Rule 2:2-3(a)(2). See D.B., 443 N.J. Super. at 442; 45 N.J.R. 738(a) (response to Comments 6 and 7) (expressing intention that regulations provide for no administrative review of "not established" finding).

was harmed or placed at risk of harm." 45 N.J.R. 738(a) (April 1, 2013) (response to Comment 86). "[P]lacing a child 'at risk of harm' may involve a lesser risk than the 'substantial risk of harm' or 'imminent danger' required to establish abuse or neglect under the statute." R.R., 454 N.J. Super. at 42. Moreover, only records relating to an "unfounded" finding are required to be expunged in their entirety, unless an exception applies under N.J.A.C. 3A:10-8.3. N.J.A.C. 3A:10-8.1(a). Although retained, the "not established" finding remains a confidential record. N.J.S.A. 9:6-8.10a.[7]

---

[7] When it proposed the regulation, the Division explained that the "not established" tier was necessary to "allow the Division to retain records where a child is found to have been harmed or placed at risk of harm. This will allow the Division to have a better and more comprehensive understanding of a family should additional referrals be received by the Division in the future." 44 N.J.R. 357(a) (Feb. 21, 2012). The Division responded to comments objecting to prohibiting expunction of "not established" records when it adopted the four-tier framework:

> The [Division] declines to change the rule. N.J.S.A. 9:6-8.40a authorizes the [Division] to define "unfounded" by regulation. The critical distinction between findings of not established and unfounded is that not established findings are based on some evidence, though not necessarily a preponderance of evidence, that a child was harmed or placed at risk of harm. Because the investigation of future allegations must include consideration of past incidents in which an involved child was harmed or placed at risk of harm,

Our primary concern with the Division's determination is the lack of any factual findings contained in the August 27, 2018 letter. That correspondence served on defendant by the Division merely informed defendant of its decision and attendant consequences by parroting the relevant statutory and regulatory language in conclusory fashion. "Judicial review of administrative agency action is a constitutional right." Silviera-Francisco v. Bd. of Educ. of City of Elizabeth, 224 N.J. 126, 136 (2016) (citing N.J. Const. art. VI, § 5, ¶ 4). Generally, when an agency's decision is not accompanied by the necessary findings of fact, we remand the matter to provide the agency the opportunity to correct the deficiency. DiMaria v. Bd. of Trs., Pub. Employees' Ret. Sys., 225 N.J. Super. 341, 347 (App. Div. 1988).

Here, the Division did not clearly identify the facts it relied upon to establish "some evidence" that defendant harmed Alexandra or placed her at risk of harm nor the weight it assigned to any evidence it considered. Further, the

<div style="margin-left: 2em;">

the critical information contained in records of not established cases must be maintained.

[45 N.J.R. 738(a) (Apr. 1, 2013) (response to comment 86).]

</div>

As characterized by the panel in R.R., a not established finding "still permanently tars a parent with a finding that there was something to the allegation." 454 N.J. Super. at 39.

Division did not specifically identify the documents in the record that formed the basis of its decision.

For example, the August 27, 2018 letter did not indicate if the caseworker determined Catherine or Alexandra were credible, particularly considering their initial statements to the caseworker. Nor can we determine to what extent the Division relied substantively on the statements in the initial, anonymous referral or if the Division's determination was based, in whole or in part, on the audio recording, a transcript of which, as we have noted, is not in the record.

We also note that the record does not contain evidence that the Division re-interviewed defendant after the initial interview by the caseworker, and after Catherine and Alexandra changed their initial statements, despite a contact sheet indicating that a second interview was scheduled. And, there is no indication in the record that the Division considered the amended TRO and consent order which granted defendant unsupervised parenting time with Alexandra, despite the availability of those documents prior to the issuance of its August 24, 2018 summary and August 27, 2018 letter.

Finally, it appears that the Division relied upon a collateral report from Dr. Paragus in support of its finding that Alexandra was harmed or at a risk of harm. Neither that collateral, nor a narrative of what Dr. Paragus concluded, is

contained in the Division's records. As such, we cannot determine to what extent the Division relied upon the collateral from Dr. Paragus to establish that defendant's conduct risked endangering Alexandra, either physically or emotionally. See N.J. Div. of Youth & Family Servs. v. S.S., 372 N.J. Super. 13, 22 (App. Div. 2004) (finding no abuse or neglect where, among other things, the Division failed to introduce evidence establishing "as a general matter" a "causal relationship between witnessing domestic violence and emotional distress in the young").

Because the Division did not detail its factual findings in the August 27, 2018 letter to defendant, we are unable to properly and effectively review its determination, particularly considering the unanswered questions we have identified. In this regard, we should not be required to conduct an extensive independent and unguided review of the record to conclude whether it "contains substantial evidence to support" a finding by the Division. See Lavezzi v. State, 219 N.J. 163 (2014) (explaining the standards of appellate review as to whether agency action is arbitrary, capricious, or unreasonable) (quoting Stallworth, 208 N.J. at 194 (2011)).

Accordingly, we vacate the August 27, 2018 final agency decision and remand for further proceedings to permit the Division to explain and amplify

the specific evidential bases for its finding that the abuse and neglect allegations against defendant were "not established."  Nothing in our decision should be interpreted as expressing our view on the scope or the result of the remanded proceedings.  Because we are remanding the matter, we do not address at this time the substance of defendant's contentions that the Division acted arbitrarily, capriciously, or unreasonably and lacked fair support in the record when it concluded that he harmed Alexandra or placed her at risk of harm.

Vacated and remanded for further proceedings.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION